**Stephen HENDLER, Plaintiff,**

v.

**INTELECOM USA, INC., Defendant.**

**No. 95–CV–2490 (JS).**

United States District Court,
E.D. New York.

April 15, 1997.

Adam T. Klein, Levy & Davis, New York City, for Plaintiff.

Timothy B. Glynn, Glynn & Mercep, Stony Brook, NY (Paul J. Siegel, of counsel, Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY), for Defendant.

### MEMORANDUM AND ORDER

SEYBERT, District Judge:

The instant action was commenced by plaintiff Stephen Hendler claiming that defendant Intelecom U.S., Inc. ("Intelecom") unlawfully discriminated and retaliated against him because of his disability, in violation of both the Americans with Disabilities Act ("ADA") and the New York Human Rights Law. Pending before the Court is Intelecom's motion for summary judgment. For the reasons set forth below, the Court denies in part and grants in part Intelecom's motion.

### FACTUAL BACKGROUND

The following facts are not in dispute.

Plaintiff Stephen Hendler ("Hendler") was diagnosed with asthma at age five and has been under treatment ever since that time. Clifford Aff. ¶ 3. His asthma has and continues to restrict his ability to breathe normally. Hendler is required to take several prescription medications to control his asthma, including Beclovent, Ventolin, Azmacort, Serevent and Prednisone. Moreover, the condition is worsened by exposure to second-hand smoke, especially prolonged exposure, which results in difficulty in breathing and increased need for asthma medication. Hendler Aff. ¶¶ 1, 4–5, 8–9. Despite this condition, with medication, Hendler is able to lead "a normal life style" and to exercise regularly on a Nordic Track. Deft's 3(g) Stmt. ¶ B; Hendler Dep. at 129, 266–68. In addition, Hendler was able to hike at most two or three miles while at Intelecom. Deft's 3(g) Stmt. ¶ B; Hendler Dep. at 267–68.

Intelecom is a New York corporation with its principal place of business in Ronkonkoma and a former principal place of business in Medford, New York. The company was started in 1993 by William Mich, the company's president and co-owner with his wife, Kathleen Mich. At the time Hendler was interviewed for his position at Intelecom, he informed William Mich, President of Intelecom, that he suffered from severe asthma and that he would have to have a smoke-free environment. Mich then hired Hendler on July 29, 1994 as Senior Vice President of Marketing and assured him that he would have a smoke-free environment. Hendler Aff. ¶¶ 8, 11. Hendler started his job on September 1, 1994 at a salary of $120,000/year. Deft's 3(g) Stmt. ¶ II.A.

Once at Intelecom, Hendler was given his own office with a door between him and other workers, a door to the outside and a window. Deft's 3(g) Stmt. ¶ B. The outside door, however, was always locked and Hendler was told by a co-worker that he was not supposed to open it. Hendler Dep. at 212.

Hendler complains that since he began working for Intelecom, he has constantly been exposed to second-hand smoke. For example, Hendler encountered smokers in the common areas and in various co-worker's offices. Coughlin Aff. ¶¶ 2, 3. In addition, Hendler's office space was poorly ventilated and smoke drifted into his office throughout

the workday. Hendler Aff. ¶ 9. This exposure to tobacco smoked caused Hendler to have on a routine basis breathing difficulties, such as constant heaviness in his chest, wheezing, shortness of breath, coughing, fatigue, headaches, inability to sleep, lack of energy and concentration and depression. *Id.* These problems required that Hendler increase the frequency and dosage levels of his asthma medications. The smoke also required Hendler to reduce the number of hours he worked on several occasions. Hendler Aff. ¶ 9.

Hendler saw his treating physician, Dr. Eileen Korpi, only once during his time at Intelecom. Deft's 3(g) Stmt. ¶ B; Korpi Aff. at 2. In March, 1995, Hendler sent a letter to Korpi complaining that the second-hand smoke at work was increasing his breathing difficulties. In addition, Hendler had contacted Dr. Clifford in the fall of 1994, requesting a prescription for Prednisone to combat breathing difficulties from the tobacco smoke at work. Clifford Aff. at 5.

Hendler routinely complained to Mich that both Mich and the other employees smoked tobacco products in his presence and that the tobacco smoke was causing him to suffer breathing difficulties. Hendler Aff. ¶ 9. Hendler specifically requested that Mich. and other employees not smoke in common areas, in Hendler's office and during director's meetings. Mich ignored these requests and stated on one occasion that "We have solved the smoking problem, Scott, Phil and Steve [Hendler] will start smoking." Mich also told Hendler to "cut it out with the smoking ... Just get through it. Grow up." On other occasions, a co-worker named Jay Morin told Hendler that he was a "pain in the ass non-smoker" and a "smoking Nazi." Hendler Aff. ¶ 9–12; Deft's 3(g) Stmt. at 9. Hendler never complained to anyone about these comments and admits that he responded to and took these comments as if they were jokes. Deft's 3(g) Stmt. at 9. In addition, Hendler asked another co-worker to keep her door closed when she smoked, to which she agreed. *Id.* at 9; Hendler Dep. at 373–75. Another co-worker referred to complaints about cigarette smoke as "stupid" and that "secondhand smoke didn't affect any-

one." Deft's 3(g) Stmt. at 10; Hendler Dep. at 376–77.

On December 27, 1994, Hendler claims he contacted the Suffolk County Department of Health and complained about the tobacco smoke at Intelecom. The DOH, however, has no record of any such complaint. Deft's 3(g) Stmt. at p. 6. Rather, it appears that the phone call was simply a request for information as to what smoking regulations exist and plaintiff concedes he never filed a formal complaint. *Id.* at 7. Moreover, at his deposition, Hendler admitted that he did not know if Intelecom knew of the call and conceded further that "I don't know for a fact if anyone most specifically tagged that call and said Steve Hendler made this call." *Id.* at 8; Hendler Dep. at 291. Mich, Intelecom's president, denies having notice of such a telephone call until after Hendler filed his complaint with the EEOC. Mich. Aff. ¶ 4.

On January 16, 1995, Hendler's employment with Intelecom was terminated, purportedly on the basis of Hendler's performance and poor attitude. Plaintiff claims, however, that his work was never criticized and that he was able to attract substantial business opportunities relating to the development of a debit card project with the Utah Jazz as well as other valuable business assets to Intelecom. Moreover, Hendler received a bonus less than one month prior to his termination. Hendler Aff. ¶ 13–14.

After receiving a right to sue letter from the EEOC, Hendler instituted this action on June 14, 1995 by summons and complaint, alleging that he had been discriminated against on the basis of his disability, in violation of both the ADA and the New York State Human Rights Law. Specifically, Hendler claims that Intelecom violated the ADA by failing to make reasonable accommodations for his disability, by terminating his employment on the basis of his disability and further by creating a hostile work environment on account of his disability. Under the New York Human Rights Law, Hendler complains that Intelecom failed to make reasonable accommodation and later discharged him because of his need for a reasonable accommodation and because of his disability. Hendler further alleges in the complaint that

he was terminated in retaliation for both his phone call to the Suffolk County DOH *and* his repeated requests for a reasonable accommodation of his disability, in violation of both the ADA and the Human Rights Law.

Plaintiff seeks: (1) declaratory judgment that Intelecom's conduct violated his rights under the ADA and the Human Rights Law; (2) a permanent injunction preventing Intelecom and its officers and agents from engaging in any conduct in violation of plaintiff's rights under the ADA and the Executive Law; (3) compensatory damages; (4) punitive damages; (5) lost earnings and benefits, with prejudgment interest, and reinstatement; and (6) attorneys' fees.

## DISCUSSION

### I. STANDARDS GOVERNING SUMMARY JUDGMENT MOTIONS

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Under the law of the Second Circuit, a district court must weigh several considerations in evaluating whether to grant a motion for summary judgment with respect to a particular claim. *Gallo v. Prudential Residential Servs., Ltd. P.*, 22 F.3d 1219, 1223 (2d Cir.1994) (internal case citations omitted). First, the moving party carries the burden to demonstrate that no genuine issue respecting any material fact exists. *Id.* (citations omitted). Second, all ambiguities and inferences must be resolved in favor of the non-moving party. *Id.* Third, the moving party may obtain summary judgment by showing that no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight. *Id.* Finally, the trial court's duty is confined to issue-finding and does not extend to issue-resolution. *Id.*

In evaluating the above considerations, a court must be mindful of whether the purported factual dispute is material, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### II. DISABILITY CLAIMS UNDER THE ADA

#### A. *General Considerations Regarding the ADA*

The ADA prohibits an employer from discriminating against an employee "because of the disability of such individual in regard to job application procedures, the hiring, advancement or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment." 42 U.S.C. § 12112(a). As defined by the ADA, "discrimination" includes, *inter alia:*

> not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business.

*Id.* § 12112(b)(5)(a) (*cited in Lyons v. Legal Aid Society*, 68 F.3d 1512, 1514 (2d Cir. 1995)). "Otherwise qualified" means that the individual "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

Under the ADA, therefore, a plaintiff can state a claim for discrimination based upon his employer's failure to accommodate his handicap by alleging facts showing: (1) that the employer is subject to the ADA; (2) that the plaintiff is an individual with a disability within the meaning of the ADA; (3) that, with or without reasonable accommodation, the plaintiff could perform the essential functions of his job; and (4) that the employer had *notice* of the plaintiff's disability and failed to provide reasonable accommodation. *Lyons*, 68 F.3d at 1515; *Joyce v. Suffolk County*, 911 F.Supp. 92, 94 (E.D.N.Y.1996).

In *Teahan v. Metro–North Commuter R. Co.*, 951 F.2d 511, 514 (2d Cir.1991), *cert.*

*denied,* 506 U.S. 815, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992), the Second Circuit held that where an employer claims that its actions have no relation to an employee's handicap, that is, where the employer "disclaims reliance" on the handicap, the analysis developed in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) for suits under Title VII of the Civil Rights Act of 1964 is appropriate. *Teahan,* 951 F.2d at 514. As such, once the plaintiff has established a prima facie case, the burden shifts to the employer to assert a neutral reason, unrelated to plaintiff's handicap, for its employment decision by articulating a "legitimate non-discriminatory reason for discharging the employee." *Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). The burden then shifts back to the plaintiff to show that the employer's stated reason is really a pretext for discrimination. *Id.* In other words, at the final step, the employee has the burden to prove that the employer's given reason for the action taken was a pretext for discrimination. *Teahan,* 951 F.2d at 514.

The parties do not dispute that Intelecom is an employer as defined under the ADA. At issue, rather, is whether Hendler's asthma qualifies as a disability under the Act.

### B. Does Hendler Have a "Disability" under the ADA?

■ In order for Hendler to establish that he has a disability within the meaning of the ADA, he must prove two elements: (1) that he has a physical or mental impairment; and (2) that such impairment substantially limits one or more of his major life activities. 29 C.F.R. § 1630.2(g)(1); *Wernick v. Federal*

*Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996).[1]

The parties do not dispute that Hendler has a physical impairment. EEOC guidelines state that an impairment includes physiological disorders that affect the respiratory system. 29 C.F.R. § 1630.2(h)(1). The relevant inquiry, therefore, is whether his asthma "substantially limits" any of his major life activities. EEOC regulations define major life activities as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, *breathing,* learning, and working." *Wernick,* 91 F.3d at 383 (citing 29 C.F.R. § 1630.2(h)(2)(i) (emphasis added)). The function at issue in this action is whether Hendler's major life activity of breathing is substantially limited.

EEOC regulations further provide that factors to consider in deciding whether an impairment is substantially limiting are: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment. 29 C.F.R. § 1630.2(j). Moreover, under these regulations, the term "substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). The EEOC interpretive guidance to these regulations also provides that the existence of an impairment is to be determined *without regard to mitigating measures such as medicines, or assistive or prosthetic devices.* Appendix to 29 C.F.R. § 1630.2(j), at 339 (emphasis added). For example, a diabetic who without insulin would lapse into a coma would be substantial-

1. The definition of "disability" under the ADA is essentially identical to that of "handicap" under the Rehabilitation Act. Because Congress intended that the case law developed under the Rehabilitation Act be generally applicable to the ADA, this Court will use the case law under the Rehabilitation Act in its analysis of the issues at bar, where applicable. *See McDonald v. Commonwealth of Pennsylvania,* 62 F.3d 92, 95 (3d Cir. 1995). A distinction between the protection afforded in the Rehabilitation Act and the ADA is that under the Rehabilitation Act, the plaintiff must ultimately prove that his or her disability is the *sole* cause for the adverse employment action. *McNely v. Ocala Star–Banner Corp.,* 99 F.3d 1068, 1074 (11th Cir.1996). The burden on an ADA plaintiff, however, is not as substantial. Rather, an ADA claimant need only prove that his or her disability was a *motivating factor* in the employment decision. *Id.* at 1077.

ly limited because the individual cannot perform major life activities without the aid of medication. *Id.*; *see, e.g., Canon v. Clark,* 883 F.Supp. 718, 721 (S.D.Fla.1995) (finding that a plaintiff with diabetes and who would lapse into a coma and die without insulin has a disability under the ADA); *Sarsycki v. United Parcel Service,* 862 F.Supp. 336, 340 (W.D.Ok.1994) (same).

This latter interpretive guidance has provoked a debate among the federal courts considering the issue, some finding that to disregard mitigating measures would be to write out of the ADA the requirement that an impairment be substantially limiting. *See Ellison v. Software Spectrum,* 85 F.3d 187, 191 n. 3 (5th Cir.1996); *Murphy v. United Parcel Service,* 946 F.Supp. 872 (D.Kan. 1996); *Schluter v. Industrial Coils, Inc.* 928 F.Supp. 1437, 1444 (W.D.Wis.1996); *Coghlan v. H.J. Heinz Co.,* 851 F.Supp. 808, 813 (N.D.Tex.1994). In *Ellison,* the Court stated in a footnote that "had Congress intended that substantial limitation be determined without regard to mitigating measures, it would have provided for coverage under § 12102(2)(A) for impairments that have the *potential* to substantially limit a major life activity." 85 F.3d at 191–92 n. 3. Similarly, in *Murphy,* the district court found that the EEOC interpretive guideline is in direct conflict with the language of the statute that requires plaintiffs in ADA cases to show that an impairment "substantially limits" their lives. 946 F.Supp. at 881. The court in *Murphy* reasoned that although agency interpretations are to be given deference according to the Supreme Court's decision in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), no deference is due when the agency language is directly at odds with the plain language of the statute itself. *Murphy,* 946 F.Supp. at 880 (citing *Public Employees Retirement System v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989)). Because of the seeming conflict between assessing the limitation without regard to assistive devices and requiring a substantial limitation, the court rejected the EEOC guideline.

Furthermore, in *Murphy,* the court compared the language of the interpretive guidance regarding medication in § 1630.2(j) with the language in the interpretive guidance to § 1630.2(*l*), which provides that someone with a medicated high blood pressure condition may not have a disability, but may be regarded as having one. The court queried as to why a person suffering from high blood pressure would have to look to the "regarded as" aspect of disability if they are covered under the "substantially limited" language without regard to medication. 946 F.Supp. at 880.

Other courts have rejected the interpretive guidance on the grounds that it creates *per se* disabilities without regard to the specific facts of each case. For example, in *Coghlan v. H.J. Heinz Co.,* 851 F.Supp. 808 (N.D.Tex. 1994), the court interpreted the guidance to mean that certain impairments, such as diabetes, would be considered *per se* disabilities under the ADA, without any additional evidence concerning limitation of life activity. *Id.* at 813.[2] Likewise, in *Schluter,* the court rejected a finding that a person is disabled in fact simply by virtue of the fact that in its uncorrected state, their impairment may be substantially limiting. *Schluter,* 928 F.Supp. at 1445.

Other courts have reached the opposite conclusion and found that there is nothing inherently inconsistent in the language of the ADA requiring substantial limitation and the language of the interpretive guidance. *See, e.g., Harris v. H & W Contracting Co.,* 102 F.3d 516 (11th Cir.1996); *Roth v. Lutheran General Hospital,* 57 F.3d 1446 (7th Cir. 1995); *Taylor v. Dover Elevator,* 917 F.Supp. 455, 461 (N.D.Miss.1996); *Piquard v. City of East Peoria,* 887 F.Supp. 1106 (C.D.Ill.1995); *Thomas v. Davidson Academy,* 846 F.Supp. 611, 617 (M.D.Tenn.1994).

*Sicard v. City of Sioux City,* 950 F.Supp. 1420 (N.D.Iowa 1996), provides an in-depth

---

**2.** Nevertheless, the diabetic plaintiff in *Coghlan* was still able to create a genuine issue of material fact as to his disability because of the effect of the diabetes even with medication, such as loss of sleep, hypoglycemia as a result of the insulin injections, chronic effect of diabetes in his eyes. 851 F.Supp. at 814.

analysis of the rationale for applying the interpretative guidance. The court first focused on the deference that is due such interpretations and concluded that the EEOC interpretive guidance with regard to mitigating measures was entitled to substantial deference. *Id.* at 1435; *see also Harris v. H & W Contracting Co.,* 102 F.3d 516, 521 (11th Cir.1996). The court accorded such deference upon finding that the EEOC's interpretation is a logical, and therefore "permissible construction of the statute." *Id.* at 1436 (quoting *Reno v. Koray,* 515 U.S. 50, ——, 115 S.Ct. 2021, 2027, 132 L.Ed.2d 46 (1995)). Second, the language does not conflict with or "write out" the substantially limits aspect of the ADA because the trier of fact still must decide whether the untreated impairment "substantially limits" any major life activity. *Id.* at 1436. Third, based on the congressional reports regarding the formulation of the ADA, congressional intent of the statute is consistent with the EEOC's interpretation. *Id.* at 1437; *see also Harris,* 102 F.3d at 521. As such, the interpretive guideline should be applied in determining whether a plaintiff has a disability under the ADA.

There is, however, an important limitation on the EEOC guidance. As the Seventh Circuit noted in *Roth,* the mere use of a mitigating measure does not automatically prove the presence of a disability; some individuals may use medication, prosthetic devices, or auxiliary aids to alleviate impairments that are not substantially limiting. *Roth,* 57 F.3d at 1454. Accordingly, the EEOC guidance does not create a list of *per se* disabilities as some courts have feared and used as a basis to reject the guidance. *See, e.g., Schluter,* 928 F.Supp. at 1445; *Coghlan,* 851 F.Supp. at 813. Rather, the impact of the impairment without considering mitigating measures is but one of several factors in determining whether it is substantially limiting. As mentioned above, other factors include the duration of the impairment, its long-term impact, and how the plaintiff's abilities compare with those in the general population.

To take heed of the EEOC interpretive guidance also comports with the intent and spirit of the ADA to help individuals with substantial physical or mental impairments overcome traditional barriers to employment. Under both the definition of impairment and substantially limiting, the EEOC has suggested that the existence or availability of mitigating measures does not negate the fact that a person has a disability and may be subject to discrimination and physical barriers to employment. *See* Appendix, § 1630.2(h), at 338 (the "existence of an *impairment* is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices") (emphasis added). For example, the magnitude of a physical impairment such as a lost limb should not be undermined simply by virtue of the fact that prosthetic devices can minimize the impact of such an impairment. The individual is no less disabled, and no less subject to discriminatory treatment, because he or she has made use of the best available medical treatment.

The case law reflects the fact that the severity of the untreated condition is only one factor in determining whether an individual is substantially limited in a major life activity. When the plaintiff is able to perform activities at the same level as a person in the general population, the EEOC guidelines suggest that there is no substantial limitation. *See* 29 C.F.R. § 1630.2(j)(1)(ii). For example, in *Heilweil v. Mount Sinai Hospital,* 32 F.3d 718, 722 (2d Cir.1994), *cert. denied,* 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995), the Second Circuit found that if a plaintiff with asthma was not limited in her ability to participate in recreational sports and exercise, plaintiff's ability to breathe only restricted her in a limited way, and thus could not be the basis for being handicapped under the Rehabilitation Act. 32 F.3d at 723 (citing *Byrne v. Board of Education,* 979 F.2d 560, 565 (7th Cir.1992)).[3] Similarly, in *Sweet v. Electronic Data Systems, Inc.,* 95–CV–3987, 1996 WL 204471, at *4 (S.D.N.Y. April 26, 1996), the court ruled that plaintiff's blurred vision and inability to read as a result of a detached retina may

---

**3.** The decision in *Heilweil* was silent as to the use and effect of medication on plaintiff's condition.

have been limiting, but was not substantially limiting. *Id.* at *6. In this regard, the court noted that vision problems, whether caused by faulty structure, overuse, or mistreatment of the eyes, are commonplace. *Id.*

Indeed, the focus of defendant's attack on plaintiff's disability is not that it has been mitigated through medicine, but that in light of *Heilweil,* Hendler does not have a disability within the meaning of the ADA because he has stated that he leads "a normal life style," "exercises on his Nordic Track on a regular basis," and can hike two to three miles. Hendler Dep. at 266, 361, 267–68. Plaintiff, on the other hand, urges that there is sufficient evidence in the record for a jury to reasonably conclude that his asthma substantially limits his breathing. Hendler has had asthma since the age of five and has throughout his life had periods of remission and exacerbation. The asthma causes periods of wheezing, shortness of breath, coughing, sputum production and increased susceptibility to respiratory infections. Hendler Aff. ¶ 1; Clifford Aff. ¶ 1. On at least four occasions, Hendler has experienced asthma attacks which have required emergency medical treatment at a Hospital emergency room. Hendler Aff. ¶ 3. Hendler has also had episodes of severe wheezing with inability to walk more than a few paces without severe dyspnea. Hendler is on a constant regimen of beta agonist inhalers, including Proventil and Ventolin, as well as Serevent.

In addition, plaintiff attempts to distinguish *Heilweil.* First, the Second Circuit was persuaded that plaintiff's asthma did not substantially impair her breathing and working because (1) plaintiff's doctor told her that her attacks could be allergic reactions to her cats; (2) plaintiff only developed asthma 2 years prior to the alleged discrimination; (3) plaintiff testified that she felt fine at the time of the lawsuit; and (4) she was able to exercise without limitation. In contrast, Hendler developed asthma nearly 50 years ago as a small child and he is under constant multi-drug therapy.

What plaintiff's argument with respect to *Heilweil* points out is precisely the message conveyed in the EEOC regulations: that each disability determination must be made on a case-by-case basis. Because one plaintiff with asthma is substantially limited in the major life activity of breathing does not mean that every plaintiff with asthma has a qualifying disability under the ADA. Conversely, because the plaintiff in *Heilweil* was not deemed to have a disability does not necessarily require that Hendler be deemed not to have a disability as well. The EEOC regulations and interpretive guidance instruct that a number of factors must be considered in determining whether an individual is substantially limited in a major life activity, including the limitation without medication, the severity of the impairment, the duration and long-term impact and the comparison with other members of the general population. In keeping with these factors, the facts in this case lead the Court to conclude that sufficient material facts are in dispute to warrant precluding summary judgment on the basis that Hendler does not have a disability. With or without medication, a reasonable jury may be able to conclude that plaintiff is substantially limited in a major life activity. The next question, therefore, is whether sufficient material facts are in dispute with regard to the other elements of plaintiff's ADA claim.

### C. *Discrimination Under the ADA*

██ Although plaintiff has raised the claim that Intelecom failed to reasonably accommodate his disability in violation of the ADA, defendant has failed to address this aspect of Hendler's arguments. Rather, Intelecom has focused its attack on plaintiff's claim that there was a hostile work environment created with respect to his disability, which also violates the statute.

Only several courts, and none in New York, have addressed whether there can be a hostile work environment claim under the ADA. For example, in *Haysman v. Food Lion, Inc.,* 893 F.Supp. 1092 (S.D.Ga.1995), the Southern District of Georgia found that verbal harassment on account of a plaintiff's disability is actionable hostile work environment harassment under the ADA, which prohibits discrimination in the "[t]erms, conditions or privileges of employment," 42 U.S.C. § 12112(a). The court reasoned that under Title VII, which has the identical language,

the Supreme Court has found that when "harassment [is] sufficiently severe or pervasive to 'alter the conditions of employment and create an abusive working environment,' [it] is actionable under Title VII because it affects a term, condition or privilege of employment." *Id.* (citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989)). Thus, the Supreme Court has declared that Title VII affords employees the right to work in an environment free from discriminatory intimidation and insult. *Id.* (citing *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986)). Likewise, the court in *Haysman* found that it would make no sense to hold that ADA language identical to that of Title VII was intended to afford disabled individuals less protection than those groups covered by Title VII. *Id.* Moreover, EEOC regulations to the ADA state that "it is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of ... any right granted or protected in this part." 29 C.F.R. § 1630.12. This Court agrees with the sound reasoning in *Haysman* and finds that hostile work environment claims are cognizable under the ADA.

■ Courts such as *Haysman* that have recognized a hostile work environment claim under the ADA have employed the same tests as applicable in Title VII cases. *See, e.g., Garcia–Paz v. Swift Textiles,* 873 F.Supp. 547 (D.Kan.1995); *Mannell v. American Tobacco Co.,* 871 F.Supp. 854 (E.D.Va. 1994). To state a claim for hostile work environment under Title VII, a plaintiff must show that the alleged harassment creates an objectively hostile or abusive work environment and that the putative victim subjectively perceives the environment to be abusive. *Haysman,* 893 F.Supp. at 1107 (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). The determination of whether the alleged conduct violates the ADA turns on the severity and pervasiveness of the conduct. *Id.*

An employee suing for discriminatory harassment based upon a hostile work environment states a claim by alleging (1) that his workplace was permeated with discriminatory intimidation was sufficiently severe or pervasive to alter the conditions of his work environment and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer. *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995) (citing *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank v. Vinson,* 477 U.S. at 65–67, 106 S.Ct. at 2404–2406; *Karibian v. Columbia University,* 14 F.3d 773, 779 (2d Cir.), *cert. denied,* 512 U.S. 1213, 114 S.Ct. 2693, 129 L.Ed.2d 824 (1994)).

■ Defendant asserts that assuming a hostile work environment claim is cognizable under the ADA, plaintiff has failed as a matter of law to establish that the comments made at Intelecom created a hostile work environment.[4] First, plaintiff's claim of harassment is based solely on a few sporadic jokes that occurred only over four months, which is not sufficiently severe or pervasive to alter the conditions of Hendler's work environment. *See Murray,* 57 F.3d at 249. In addition, Intelecom asserts that plaintiff perceived the comments as jokes and he too responded in "a joking manner" to the com-

---

**4.** One of the arguments that defendant puts forth to defeat the claim of hostile work environment is that the person hiring a disabled person is presumed not to terminate them on the basis of a known disability at the time of hire (thus, there is no presumption of pretext). *See Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173 (8th Cir. 1992); *Proud v. Stone,* 945 F.2d 796 (4th Cir. 1991). The Court finds these cases inapposite to the case at bar. In *Lowe,* the Eighth Circuit set aside a jury verdict in favor of plaintiff because of the weakness of plaintiff's evidence in relation to the fact that defendant knew plaintiff's age when he hired him and would not have fired him shortly thereafter on that basis. 963 F.2d at 174–175. The court confined this holding to the particular circumstances of the case and did not enunciate a "presumption" of non-discrimination. *Id.* at 175. Similarly, in *Proud,* the Fourth Circuit found that when there is no inference of discriminatory animus and there are enumerated job deficiencies, an inference can be then drawn that the same person who hired a plaintiff in a protected class would not have fired him. 945 F.2d at 798. Such is not the case in this action. The facts indicate that plaintiff had received a bonus shortly before his termination and facts are in dispute as to plaintiff's performance.

ment by a co-worker that he was "a pain in the ass non-smoker." Hendler Dep. at 369. Furthermore, according to defendant, none of the other comments were hostile and intimidating. For example, Deborah Gazzola, a co-worker, said she would close her office door when she smoked, but that the President's wife would never stop smoking. According to defendant, none of these comments rise to the level of harassment found actionable in other cases. *See Haysman*, 893 F.Supp. at 1108.

Second, defendant contends that any jokes directed at plaintiff were not based on his disability. Rather, the jokes were made because plaintiff is a non-smoker. Defendant points out that plaintiff himself conceded that he believed the jokes were made because he complained so much about the tobacco smoke. Hendler Dep. at 393–394.

Finally, defendant argues that such behavior cannot be imputed to the employer, Intelecom. First, most of the comments were made by non-supervisory co-workers and plaintiff never complained to anyone about the comments. Hendler Dep. at 369–72. Second, the comments were so sporadic that the requirement that Intelecom should have known about the harassment is not met. *See Murray*, 57 F.3d at 250–51. Third, the comments made by Intelecom's agent William Mich, as president, were not perceived as hostile or unwelcome by plaintiff because he said at least one of them was funny. Hendler Dep. at 372.

The plaintiff asserts, on the other hand, that material issues of fact are in dispute with respect to the impact on the work environment created by these comments. The Court agrees. A reasonable juror could conclude that the comments made were pervasive and severe, and further, that they were related to the fact that he had difficulty breathing. For example, an employee confined to a wheelchair who is chided about not being able to climb the stairs is being harassed on the basis of his disability regardless of the fact that the comments are directed at the environment or his ability to function under the working atmosphere. Furthermore, because plaintiff perceived that a comment was meant to be a joke does

not necessarily negate its offensiveness or the fact that the comment was unwelcome. A reasonable juror could also impute knowledge onto Mich, who himself made comments about Hendler's inability to tolerate smoke and who conducted meetings while smoking, despite Hendler's request that he refrain from doing so. For these reasons, therefore, the Court cannot rule as a matter of law that plaintiff has failed to establish a claim of hostile work environment. As such, and in keeping with the Court's finding that material issues of fact exist as to whether Hendler has a disability as defined under the ADA, the Court denies Intelecom's motion for summary judgment with respect to the ADA claim for discrimination.

## III. PLAINTIFF'S CLAIMS UNDER THE NEW YORK HUMAN RIGHTS LAW

### A. *Disability Under NYSHRL*

Hendler has also claimed that Intelecom's actions violate the provisions of the New York Human Rights Law protecting against disability discrimination. Section 296(1) of the New York Human Rights law makes it an unlawful discriminatory practice for an employer, because of the disability of any individual, "to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. L. § 296(1)(a) (McKinney Supp. 1997). The Human Rights Law defines "disability" as a "physical, mental or medical impairment resulting from anatomical, physiological or neurological conditions which *prevents* the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. L. § 292(21) (emphasis added) (McKinney Supp.1997). In all employment cases, however, the term disability is limited to disabilities which do not "prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." *Id.*

There are two important distinctions between the definitions of disability under the

ADA and the NYSHRL: (1) the NYSHRL requires prevention, i.e., complete rather than substantial limitation, of (2) a normal bodily function rather than a major life activity. Defendant argues that any distinction between the definitions is immaterial since it argues that Hendler is not substantially limited in a life activity, and accordingly under the more stringent NYSHRL standard, plaintiff is likewise not prevented from the exercise of a normal bodily function. Plaintiff asserts that the definitions under the ADA and the HRL are virtually identical and should be treated the same. *Fitzgerald v. Alleghany Corp.*, 904 F.Supp. 223, 229 (S.D.N.Y.1995); *Ashker v. International Business Machines Corp.*, 168 A.D.2d 724, 563 N.Y.S.2d 572 (3d Dep't 1990). The legislative history of the New York Human Rights Law indicates that it was intended to cover the same types of disabilities as protected under the ADA and the Rehabilitation Act, and includes persons with physical or mental impairments which substantially limit one or more major life activities. *Executive Dep't Mem.*, 1983 McKinney's Session Laws of New York, at 2705, *cited in Fitzgerald*, 904 F.Supp. at 229–30 n. 12. As such, for the reasons that the Court found that material issues of fact exist as to whether plaintiff is disabled under the ADA, material issues of fact also exist as to whether plaintiff is disabled under the NYSHRL. The issue, therefore, is whether there is a duty to provide reasonable accommodations under the Human Rights Law.

### B. *Reasonable Accommodation Under the NYSHRL*

■ Defendant asserts that plaintiff's claim that Intelecom violated the New York Human Rights Law by failing to make reasonable accommodations is fatally defective because unlike the ADA, the HRL does not impose a duty upon an employer to accommodate the disability of an employee. *City of New York v. Cole*, 48 N.Y.2d 707, 709, 397 N.E.2d 1171, 422 N.Y.S.2d 367 (1979) (analyzing pre–1979 amendments to § 292(21); *LaMarre v. Granville Cent. School*, 106 A.D.2d 838, 484 N.Y.S.2d 236 (3d Dep't 1984)). Defendant supports this argument by the language of the HRL, which excludes from its protection those individuals whose disabilities prevent them from "performing [their job duties] in a reasonable manner." N.Y. Exec. L. § 292(21). Thus, defendant argues, it would be inconsistent to require an employer to reasonably accommodate a disabled employee when the statute does not require hiring someone who is prevented from performing their job duties.

Simply because the statute requires that a complainant establish that they can perform the job in a reasonable manner, however, does not mandate a finding that reasonable accommodation is not required. Under the ADA, for example, a plaintiff must establish that they are "otherwise qualified" for the position and are able to perform the essential functions of the job, with or without accommodation. Yet, the ADA also requires that employers make reasonable accommodations for the disabilities of their employees. In this respect, the HRL, which requires plaintiffs to show they are not prevented from performing in a reasonable manner the essential functions of the job is consistent with the requirements under the ADA. This does not answer the question, however, of whether the NYSHRL also requires reasonable accommodation as does the ADA.

Plaintiff points to the recent decision of the New York State Commission on Human Rights in *Karuschkat v. Rothman*, Notice of Order After Hearing, June 21, 1996, for the proposition that reasonable accommodation is required under the NYS Human Rights Law. The Human Rights Commission first looked to the definition of "disability" under the HRL, which applies to medical conditions "which do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation." N.Y. Exec. L. § 292(21). The Commission went further and held that "the definition of 'disability' contained in the Human Rights Law necessarily implies that employers have an affirmative duty to reasonably accommodate a disabled employee, if said employee can perform the essential duties of his/her position. Such an interpretation of the Human Rights Law would conform it with the provisions of the federal Americans with Disabilities Act." *Id.* at 13.

Although defendant is correct in asserting that there is no express duty under New York law to reasonably accommodate disabled persons, except in the context of public accommodations, this does not mean that such a requirement cannot be reasonably inferred to give full effect to the intent of the Human Rights Law. The cases cited by defendant merely stand for the proposition that a disabled person must be able to reasonably perform the activities required for a particular position, and do not explicitly reject the idea that an employer has a duty to accommodate those persons. In *City of New York v. Cole,* 48 N.Y.2d 707, 397 N.E.2d 1171, 422 N.Y.S.2d 367 (1979), for example, the Court of Appeals rejected the disability claim of a special officer of the New York City Department of Social Services because he could not lift heavy weights as required by the job, and thus under the statute, he could not perform the essential functions of the job. Moreover, that case was decided in 1979, prior to amendments that provided protection "to persons with a broader range of disabilities." *LaMarre,* 106 A.D.2d at 839, 484 N.Y.S.2d 236. In *Cole,* the Court of Appeals applied the definition of disability as "conditions which are unrelated to the ability to engage in the activities involved in the job or occupation." *Cole,* 48 N.Y.2d at 707, 422 N.Y.S.2d at 367, 397 N.E.2d at 1172. Under the amended HRL, disability now includes conditions, even if related to the job activities, that do not prevent the complainant from reasonably performing the job functions.

Defendant also relies on *LaMarre v. Granville Central School, et al.,* 106 A.D.2d 838, 484 N.Y.S.2d 236 (3d Dep't 1984) to support its argument that no reasonable accommodation is required. In *LaMarre,* the Appellate Division dismissed a claim by a custodian who claimed that he was discriminated against on the basis of a disability. The school district had hired plaintiff as a temporary custodian, but then later decided not to offer him full-time employment on the basis of his inability to perform certain job functions, such as climbing ladders and repetitive lifting. The court found that unless it was shown that the plaintiff's physical condition precludes him from performing his job in a reasonable manner, the defendant could not

terminate him on the basis of his disability. Finding that ladder climbing and lifting were required duties of the school's custodians, however, the Court found that the employer lawfully terminated him.

Nothing in *LaMarre* or *Cole,* however, expressly rejects the idea of reasonable accommodation. Rather, they focused on the threshold issue of whether the complainant could perform the functions of the job despite the disability in question. In this case, there is no dispute that plaintiff could reasonably perform the functions of his job in spite of his asthma.

Nevertheless, the Court cannot find any basis in the case law or in the HRL to conclude that an employer is required to provide reasonable accommodations to employees with disabilities, despite the finding of the Human Rights Commission in *Karushkat.* While the New York legislature chose to expressly require reasonable accommodation in places of public accommodation, it chose not to make such a requirement of private employers. Although the Court is cognizant of the fact that the New York HRL is generally construed in accordance with federal employment discrimination law, such construction is not mandated where there is no similar provision in the state law equivalent.

Because there is no requirement of reasonable accommodation, however, does not mean that plaintiff has failed to establish a prima facie case of disability discrimination in violation of the HRL. To set forth such a claim, the plaintiff need allege and prove that (1) he suffers from a disability as defined in the statute; (2) the disability caused the behavior for which the individual was terminated. *McEniry v. Landi,* 84 N.Y.2d 554, 558, 644 N.E.2d 1019, 1021, 620 N.Y.S.2d 328, 330 (1994). The burden then shifts to the employer to demonstrate that the disability prevented the employee from performing the duties of the job in a reasonable manner or that the employee's termination was motivated by a legitimate non-discriminatory reason. *Id.* Because material facts are in dispute regarding the elements of this claim, the Court denies summary judgment with re-

spect to plaintiff's NYSHRL claim for disability discrimination, although reasonable accommodation is not required.

## IV. RETALIATION

■ Plaintiff's final claim is that he was terminated in retaliation for his phone call to the Suffolk County Department of Health and because of his repeated complaints about the failure to accommodate his non-smoking needs, in violation of both the ADA and the HRL. New York courts apply the same analysis for retaliation claims as in federal employment cases. *New York State Office of Mental Retardation & Developmental Disabilities v. New York State Div. Of Human Rights,* 164 A.D.2d 208, 563 N.Y.S.2d 286 (3d Dep't 1990).

To establish a prima facie case of retaliation under either the ADA or the NYSHRL, plaintiff must show: (1) that the employer took adverse action against the plaintiff after becoming aware of his protected conducted and (2) that "a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." *Murray,* 57 F.3d at 251 (citing *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993)). If plaintiff establishes this prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). The burden then shifts back to the plaintiff to prove that the articulated reason is a pretext and the real reason for the adverse action was plaintiff's protected activity.

In this case, defendant asserts that plaintiff has failed to establish that defendant acted because of the telephone call to DOH. Defendant asserts that it did not know of the phone call in the first place because plaintiff never told anyone he called the DOH and further that there is no evidence that anyone at DOH contacted defendant. Hendler Dep.

at 74–75, 285. The Court concurs that there is no causal link between the telephone call to DOH and the termination of plaintiff's employment at Intelecom, and plaintiff has also conceded this issue. With respect to the retaliation claim on the basis of the call to the DOH, therefore, that claim is dismissed.

Plaintiff argues, on the other hand, that he was also terminated because of his request for a reasonable accommodation. This, plaintiff argues, creates the causal nexus required to assert a retaliation claim. *Muller v. Costello,* No. 94–CV–842, 1996 WL 191977, at *6 (N.D.N.Y.1996) (verbal harassment in response to request for smoke-free work environment establishes a causal connection in retaliation claim under the ADA). Hendler also asserts that the reasons asserted by the defendant for his termination are pretextual because his performance was more than satisfactory, no one ever criticized his work performance, he attracted substantial business opportunities relating to the development of a debit card project with the Utah Jazz and he received a bonus less than one month prior to his termination.

Defendant counters this argument by asserting that Hendler has only rebutted the alleged pretextual reasons by conclusory allegations and has failed to address with specific facts that the reasons stated in the termination letter are not true. First, Hendler failed to develop and market a discounted long distance service delivery system to residents of Long Island despite the fact that he was hired to do so. Second, Hendler's efforts to get clients to engage in a debit card project only resulted in a few negotiations with no concrete results. Third, Hendler failed to market effectively and generate sales for custom software development products. Fourth, Hendler had a poor attitude and attempted to "micro-manage" and had "poor judgment." [5]

The Court finds that plaintiff has presented sufficient evidence to create a factual dispute as to the motives and reasons for his

---

5. Defendant also contends that it is entitled to the presumption that it did not discharge Hendler on the basis of his disability because Hendler advised Mich. of the problem and his need for a smoke-free environment and hired him

anyway. *Proud v. Stone,* 945 F.2d 796 (4th Cir. 1991). As noted in footnote 4, however, the Court finds that reliance on *Proud* is misplaced under the facts of this case.

termination from Intelecom, precluding a grant of summary judgment on this part of his ADA retaliation claim. As discussed above, however, the Court finds that the NYSHRL does not require an employer to affirmatively provide reasonable accommodations for an employee's disability. Because plaintiff's complaints about the lack of reasonable accommodations is not a complaint regarding an activity protected under the NYSHRL, therefore, the retaliation claim under state law is dismissed. Accordingly, defendant's motion for summary judgment on plaintiff's retaliation claim is denied with respect to the ADA, but is granted with respect to the Human Rights Law.

### CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is denied in part and granted in part. In particular, summary judgment is denied with respect to all claims except for plaintiff's claim for retaliation under the New York State Human Rights Law, consistent with this opinion. The parties are to submit their Joint Pre–Trial Order within 45 days of the date of this order.

SO ORDERED.