United States Court of Appeals,

Eleventh Circuit.

No. 95-8526.

Ellen T. HARRIS, Plaintiff-Appellant,

v.

H & W CONTRACTING COMPANY, Defendant-Appellee.

Dec. 31, 1996.

Appeal from the United States District Court for the Middle District of Georgia. (No. 94-CV-23-COL), J. Robert Elliott, Judge.

Before BIRCH and CARNES, Circuit Judges, and MICHAEL[*], Senior District Judge.

CARNES, Circuit Judge:

In this Americans with Disabilities Act ("ADA") case, Ellen T. Harris appeals from the district court's entry of summary judgment in favor of the defendant, H & W Contracting Company (the "Company"). The district court granted summary judgment in favor of the Company on the grounds that Harris, who has been diagnosed with and receives ongoing treatment for Graves' disease, cannot show that she has a "disability" within the meaning of the ADA. We reverse, because we find that genuine issues of material fact do exist about whether Harris has a disability within the meaning of the ADA, and there is no other basis in the record for affirming the grant of summary judgment.

In addition to her ADA claim, Harris brought a state law tort claim against the Company for intentional infliction of emotional distress. We agree with the district court that Harris' emotional

---

[*]Honorable James H. Michael, Senior U.S. District Judge for the Western District of Virginia, sitting by designation.

distress claim lacks evidentiary support in the record, and we affirm the entry of summary judgment in favor of the Company as to that claim.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In 1973, approximately sixteen years before joining the Company, Harris was diagnosed as having active Graves' disease, an endocrine disorder affecting the thyroid gland. Since that time, Harris has continuously taken medication, "Synthroid," to control her condition. In general, the ongoing treatment of Harris' medical condition has been successful. Since 1973, with one notable exception, Harris' thyroid problems have not seriously interfered with her work or other life activities, because her thyroid condition has been fully controlled with medication.

In December 1989, the Company hired Harris as its comptroller, making her responsible for the maintenance of the Company's financial records and for certain other financial activities of the Company. While she was employed there, the Company was entirely satisfied with Harris' performance as comptroller. Although Harris made some "mistakes" as comptroller, the Company considered them to be "minor." When questioned about Harris' performance, the Company's president, Aldric Hayes, stated that up until the time Harris left the Company "[a]s far as I was concerned Ellen had done a real good job," although some additional problems with her work did come to light after that time.

In December 1992, Harris experienced a "panic attack." Thereafter, in January 1993, Harris was hospitalized for eight days in the psychiatric ward. According to Harris, she learned during

her hospitalization that she had been overdosed with her thyroid medication, due to a change in the manufacture of the drug. There is no dispute that this overdose caused Harris' panic attack and subsequent illness, and that once her dosage was corrected, Harris' thyroid condition did not limit Harris' ability to work or perform other normal activities. Harris' doctor certified her as able to return to her normal job duties beginning on February 1, 1993.

In January 1993, while Harris was on sick leave, the Company hired another individual, Fred Sanders, to be comptroller. When Harris began to return to work on a gradual basis in January 1993, she was at first unaware that Sanders had assumed her job title. However, on February 12, 1993, Harris questioned Hayes about the status of her responsibilities. In response to those questions, Hayes told Harris that Sanders was "in charge" and was now the comptroller. Moreover, according to Harris, Hayes told her that she would need to seek other employment when she was feeling better or "within the next several months." Upon learning that she had been removed from her position as comptroller, and that Sanders had taken her place, Harris left the workplace. Three days later, on February 15, 1993, Hayes wrote Harris a letter in which he denied terminating Harris, but acknowledged that he had removed her from the position of comptroller and that her employment with the Company had come to an end.

In April 1993, Harris filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that the Company had discriminated against her in violation of the ADA. After receiving her right-to-sue letter from the EEOC, Harris filed this lawsuit,

alleging a claim for discrimination in violation of the ADA and a pendent Georgia state law claim for intentional infliction of emotional distress.

On April 6, 1995, the district court entered an order granting summary judgment to the Company on both the ADA claim and the state law claim. In granting summary judgment on the ADA claim, the district court held that Harris could not show that she has a "disability" within the meaning of the ADA. Turning to the state law claim for intentional infliction of emotional distress, the district court found that claim to be "completely lacking in evidentiary support."[1] This appeal followed.

## II. STANDARD OF REVIEW

We review *de novo* a district court's grant of summary judgment, applying the same standards as the district court. *E.g., Jones v. Firestone Tire & Rubber Co.,* 977 F.2d 527, 535-36 (11th Cir.1992), *cert. denied,* 508 U.S. 961, 113 S.Ct. 2932, 124 L.Ed.2d 682 (1993). Summary judgment is appropriate if the pleadings,

---

[1] We agree with the district court's characterization of the state of the record concerning Harris' intentional infliction of emotional distress claim. While, as we discuss hereafter, the Company's decision to replace Harris as comptroller may have violated the ADA, there is no basis in the record for concluding that the Company's behavior was sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress under the standards of Georgia law. *See, e.g., Yarbray v. Southern Bell Telephone & Telegraph Co.,* 261 Ga. 703, 706, 409 S.E.2d 835, 837 (1991) ("The conduct complained of must have been extreme and outrageous to support a claim under this theory."); *Cornelius v. Auto Analyst, Inc.,* 222 Ga.App. 759, 476 S.E.2d 9, 11 (1996) ("The conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.") (citation and internal quotation marks omitted). We affirm without further discussion the district court's grant of summary judgment as to that claim.

depositions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In reviewing a grant of summary judgment, we view all the evidence in the light most favorable to the party opposing the motion. *E.g., Pritchard v. Southern Co. Servs.,* 92 F.3d 1130, 1132 (11th Cir.1996).

### III. ANALYSIS

*A. The Americans with Disabilities Act*

In 1990, Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C.A. § 12101(b)(1) (West 1995). To accomplish that purpose, the ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a). The statute further operates to create an affirmative duty for employers to reasonably accommodate individuals with disabilities. In ADA parlance, the word "discriminate" is defined broadly to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." *Id.* § 12112(b)(5)(A). "Disability" is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment;  or

(C) being regarded as having such an impairment.

*Id.* § 12102(2).

In order to establish a prima facie case under the ADA, Harris must show that:  (1) she has a disability;  (2) she is a qualified individual;  and (3) she was discriminated against because of her disability. *See* 42 U.S.C. § 12132;  *see also, e.g., Pritchard v. Southern Co. Servs.,* 92 F.3d 1130, 1132 (11th Cir.1996).  In granting summary judgment on Harris' ADA claim, the district court held that Harris had failed to demonstrate that any genuine issues of material fact existed as to whether Harris has a disability within the meaning of the ADA—the first element of her prima facie case.  In view of that holding, the district court was not required to, and did not, consider whether Harris had established the second and third elements of her prima facie case—whether she is a qualified individual, and whether she was discriminated against because of her disability.

On appeal, the parties devote the bulk of their attention to whether Harris has a disability within the meaning of the ADA, and so do we.  Finding that genuine issues of material fact exist as to that element of Harris' prima facie case, we will also consider whether the record concerning the remaining two elements of Harris' prima facie case nonetheless supports affirming the district court's grant of summary judgment.  *See, e.g., Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957) ("A successful party in the District Court may sustain its judgment on

any ground that finds support in the record.").

## B. *Whether Harris Has a Disability*

Harris contends that her circumstances meet the ADA's definition of disability in two ways.  First, she contends that her medical condition fits within the definition of disability provided by 42 U.S.C. § 12102(2)(A), in that she has an impairment that substantially limits one or more of her major life activities. Second, she contends that the Company has regarded her as having such an impairment, as provided by § 12102(2)(C), even if she does not have one in fact.  Harris does not contend, and we do not address, whether she has a "record of such impairment" sufficient to bring her condition within the alternative definition of disability provided by § 12102(2)(B).

Turning to Harris' first theory, the evidence in the record would be sufficient to permit a jury to find that Harris has an impairment within the meaning of the ADA. Harris has come forward with evidence that she has a thyroid problem, and that she was diagnosed in 1973 as having active Graves' disease.  The Company has not come forward with any evidence to the contrary.  The applicable federal regulations, the validity of which the Company does not challenge, define "impairment" to include:

> [a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems:  neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and *endocrine.*

29 C.F.R. § 1630.2(h)(1) (1996) (emphasis added).

It is common knowledge that the thyroid gland is an integral part of the endocrine system, as can be verified by turning to an

ordinary dictionary. *See, e.g., Random House Unabridged Dictionary* 1980 (Stuart B. Flexner & Leonore C. Hauck eds., 2d ed.1993) (defining the thyroid gland as "a two-lobed endocrine gland, located at the base of the neck that secretes two hormones that regulate the rates of metabolism, growth, and development"). Therefore, disorders of the thyroid gland fit squarely within the meaning of impairment, as that term is defined by the applicable federal regulations. However, establishing the existence of an impairment is only half of Harris' burden in demonstrating that she has a disability within the meaning of § 12102(2)(A). In order to for Harris to demonstrate that her impairment rises to the level of a disability, she must also show that her impairment substantially limits one or more of her major life activities.

The Company contends that Harris cannot meet the second prong of the definition of disability found in § 12102(2)(A), because Harris has not been substantially limited in any of her major life activities due to her thyroid problem. The Company points out that the symptoms Harris experienced in late 1992 and early 1993 were but a temporary episode associated with an overdose of Harris' thyroid medication and that Harris has otherwise been unimpeded in her life activities since first experiencing thyroid problems in 1973. According to the Company, the transitory nature of Harris' symptoms should preclude a finding that her impairment substantially limits her in any of her life activities. Harris counters that the Company's interpretation of § 12102(2)(A) fails to recognize that, as Harris puts it, the manifested symptoms of "an underlying disability may be episodic or temporary in nature

while the impairment itself is both chronic and permanent."

The Company's position regarding the interpretation of § 12102(2)(A) is not a frivolous one. At first glance, it is difficult to perceive how a condition that is completely controlled by medication can substantially limit a major life activity. However, the appendix to the applicable federal regulations provides explicit guidance on this point, and that guidance is directly contrary to the Company's position. The appendix to the regulations provides:

> [A]n impairment is substantially limiting if it significantly restricts the duration, manner or condition under which an individual can perform a particular major life activity as compared to the average person in the general population's ability to perform that same major life activity. Thus, for example, an individual who, because of an impairment, can only walk for very brief periods of time would be substantially limited in the major life activity of walking. An individual who uses artificial legs would likewise be substantially limited in the major life activity of walking because the individual is unable to walk without the aid of prosthetic devices. Similarly, *a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication.*
>
> ....
>
> *The determination* of whether an individual is substantially limited in a major life activity *must be made on a case by case basis, without regard to mitigating measures such as medicines,* or assistive or prosthetic devices.

29 C.F.R. app. § 1630.2(j) (1996) (emphasis added).

The Company acknowledges that its interpretation of § 12102(2)(A) is at odds with the foregoing language, but contends that we should give effect to its interpretation of the statute rather than that contained in the appendix to the federal regulations. We disagree. While the "Interpretive Guidance" provided by the EEOC in the appendix to the federal regulations is

not law, the Supreme Court has held:

> [When] Congress has not directly addressed the precise
> question at issue, the court does not simply impose its own
> construction on the statute, as would be necessary in the
> absence of an administrative interpretation. Rather, if the
> statute is silent or ambiguous with respect to the specific
> issue, the question for the court is whether the agency's
> answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984)
(footnotes omitted). The Supreme Court has long recognized that an
agency's interpretation of a statute it is entrusted to administer
should be given "considerable weight" and should not be disturbed
unless it appears from the statute or legislative history that
Congress intended otherwise. *Id.* at 844-45, 104 S.Ct. at 2782-83.

Without discussing *Chevron,* the Company contends that
acceptance of the EEOC's interpretation of the statute would render
meaningless the statutory requirement that an impairment must
substantially limit a major life activity if it is to be considered
a disability. We disagree.

First, there is no direct conflict between the interpretation
contained in the appendix to the regulations and the language of
the statute itself. There is nothing inherently illogical about
determining the existence of a substantial limitation without
regard to mitigating measures such as medicines or assistive or
prosthetic devices, and there is nothing in the language of the
statute itself that rules out that approach. Therefore, the
question becomes one of congressional intent, and we look to the
ADA's legislative history for guidance.

A review of the relevant House and Senate reports reveals

that the interpretation of § 12102(2)(A) contained in the appendix to the applicable federal regulations is firmly rooted in the ADA's legislative history. *See* H.R.Rep. No. 101-485(II), 101st Cong., 2nd Sess., at 52 (1990); H.R.Rep. No. 101-485(III), 101st Cong., 2nd Sess., at 28-29 (1990); S.Rep. No. 116, 101st Cong., 1st Sess., at 23 (1989) 1990 U.S.C.C.A.N. 267. We cannot disregard the interpretive guidance contained in the appendix prepared by the federal agency charged with enforcing the ADA, when that guidance is based on a permissible construction of the statute and is supported by the statute's legislative history. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 841-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984).

The Company contends that, even if mitigating measures such as medicines must be disregarded in the determination of whether an individual is substantially limited in a major life activity, Harris has failed to come forward with sufficient evidence to avoid summary judgment. The Company argues that the mere use of a mitigating measure does not automatically prove the presence of a disability, because some persons may use such measures to alleviate impairments that are not substantially limiting. We have no quarrel with that argument, as far as it goes, and we note that the Seventh Circuit recently held as much in *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995). However, Harris does not contend that her use of a mitigating measure *automatically proves* that she has a disability. Instead, she contends that the facts of this case, together with the materials the court may consider on a motion for summary judgment, when viewed in the light most

favorable to her, are sufficient to create a genuine issue of material fact about whether she is substantially limited in a major life activity once the ameliorative effects of her medication are disregarded.

A plaintiff is not required to prove her case in order to withstand a motion for summary judgment.  At the summary judgment stage, a plaintiff need only show the existence of genuine issues of material fact that should be decided by the trier of fact.  In determining whether a genuine issue of material fact exists, the court "may consider pleadings, depositions, answers to interrogatories, admissions on file, affidavits, oral testimony, *matters subject to judicial notice,* stipulations and concessions, and other materials admissible in evidence or otherwise usable at trial." *Clay v. Equifax, Inc.,* 762 F.2d 952, 956 (11th Cir.1985) (dicta) (emphasis added);  *see also* 6 James W. Moore et al., Moore's Federal Practice § 56.15[7] (2d ed.1996) (same);  10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (2d ed.  1983) ("The doctrine of judicial notice applies to motions under Rule 56.").

We take judicial notice that Graves' disease is a condition that is capable of substantially limiting major life activities if left untreated by medication.  It is appropriate for us to judicially notice that fact, because it is not subject to reasonable dispute, and it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," *see* Fed.R.Evid. 201(b)(2).  For example, *The Merck Manual of Diagnosis and Therapy* (Robert Berkow et al. eds., 15th

ed.1987) states:

> Graves' disease *consists of hyperthyroidism, but also is characterized by one or more of the following: goiter, exophthalmos, and pretibial myxedema. ...*

> Many symptoms and signs are associated with hyperthyroidism. They are the same for all hyperthyroidism with some exceptions ... which are confined to Graves' disease. The clinical presentation may be dramatic or subtle. The more common signs are: (1) goiter; (2) tachycardia; (3) widened pulse pressure; (4) warm, fine, moist skin; (5) tremor; (6) eye signs ...; and (7) atrial fibrillation. The most frequent symptoms are: (1) nervousness and increased activity, (2) increased sweating, (3) hypersensitivity to heat, (4) palpitations, (5) fatigue, (6) increased appetite, (7) weight loss, (8) tachycardia, (9) insomnia, (10) weakness, and (11) frequent bowel movements (occasionally diarrhea).

*Id.* at 1038-39 (emphasis in original) (bold face type omitted). Moreover, in extreme cases, hyperthyroidism can lead to "thyroid storm," which is characterized by symptoms such as "fever; marked weakness and muscle-wasting; extreme restlessness with wide emotional swings; confusion, psychosis, or even coma," *id.* at 1039. In such a case, "[t]he patient may present with cardiovascular collapse and shock," *id.* "Thyroid storm ... results from untreated or inadequately treated thyrotoxicosis and ... *is a life-threatening emergency requiring prompt and specific treatment* ...." *Id.* (emphasis in original). *Accord* 3A Roscoe N. Gray & Louise J. Gordy, *Attorneys' Textbook of Medicine* §§ 77.23 (1996) (discussing the symptomatic effects of Graves' disease and hyperthyroidism).

Understandably, the Company makes no effort to show that Graves' disease is incapable of substantially limiting the life activities of those affected by it. Instead, the Company asserts that the record is completely devoid of any evidence Harris' particular thyroid problem would substantially limit her life

activities if left untreated. In making that assertion, the Company overlooks important evidence in the record.

First, it is undisputed that Harris has received ongoing treatment for her thyroid condition for more that twenty years. While receiving this ongoing treatment, Harris has been able to function without any significant problems, so long as the medication is maintained at a proper dosage. Additionally, we know that if Harris receives too much of her thyroid medication, she may experience a panic attack and find herself hospitalized in the psychiatric ward, as happened in January 1993. We need not decide if that evidence by itself would be sufficient to raise a genuine issue of fact about whether, without her medication, Harris would be substantially limited in her major life activities. There is more evidence in the record.

At her deposition, Harris was questioned about what she knew about her medical condition, and the purpose of the medication she takes to control it. During her direct examination, the following exchange took place:

Q. I think you have testified that you have a thyroid disorder, endocrine disorder.

A. Yes.

Q. And you have been on medication for how long for that?

A. Since 1973.

Q. Do you understand what the medication is for, the purpose of the medication?

A. To replace what the thyroid doesn't produce anymore.

Q. Do you know what would happen if you didn't take the medication?

A. Sure.

Q. What?

A. I would go into a coma and die.

Deposition of Ellen T. Harris 89 (Aug. 2, 1994). We are satisfied that the evidence in this case, including Harris' deposition testimony and matters subject to judicial notice, is sufficient to create a genuine issue of material fact about whether Harris' medical condition, in the absence of mitigating measures, would substantially limit her major life activities. The district court erred when it concluded that Harris cannot show that she has a cognizable disability under the ADA.

Turning to Harris' alternative theory, we find that Harris has also demonstrated the existence of a genuine issue of material fact about whether the Company regarded her as having a substantially limiting impairment, even if she does not actually have one, as contemplated by 42 U.S.C. § 12102(2)(C). While Harris was away on sick leave, the Company's president, Aldric Hayes, hired another person to take over permanently as comptroller, even though Hayes had previously been satisfied with Harris' performance in that position. That alone would not be enough, but according to a report taken by the Georgia Department of Labor Field Office in connection with Harris' claim for unemployment insurance benefits, Hayes gave the following explanation for that action:

> In my opinion, she did work for me good for a long time, and I do not feel I had to put my company on the line, and *I felt that the company was being put in jeopardy,* at a disadvantage *due to her type illness* and I wanted to give her time to fully recover before advising her of my decision to put someone else as comptroller, in an effort to take some of the stress of the job off her. Had I had the opportunity to tell her of this, I could have explained why I was doing this, but I felt that was not the time, due to the type illness she had....

Georgia Department of Labor, Statement of Interested Parties (March 4, 1993) (emphasis added). Viewing that evidence in the light most favorable to Harris, as we are required to do at this stage, we are persuaded that a genuine issue of material fact exists as to whether Hayes decided to permanently replace Harris as comptroller because he regarded her as having a substantially limiting impairment. The district court erred when it reached the opposite conclusion in granting summary judgment in favor of the Company.

*C. Whether Material Fact Questions Exist Regarding the Other Elements of Harris' Prima Facie Case*

In order to prevail on her ADA claim, Harris must do more than show that she has a disability. She must also prove the other two elements of her prima facie case—that she was a qualified individual and that she was discriminated against because of her disability. At the summary judgment stage, Harris bears the burden of coming forward with sufficient evidence to create genuine issues of material fact regarding each of those elements. We readily conclude that she has.

On the qualification issue, there is evidence that Hayes admitted to the Georgia Department of Labor representative that Harris "did work for me good for a long time." That is consistent with his deposition testimony that he did not have any real problems with Harris' performance as comptroller "until the end" and that "[a]s far as I was concerned Ellen had done a real good job." Deposition of Aldric M. Hayes 17, 18 (August 2, 1994). In view of the fact that Harris held her job with the Company for over three years, and that Hayes had no real problems with her performance "until the end" (which was around the time of her

hospitalization), we are satisfied that Harris has demonstrated the existence of a genuine issue of material fact as to whether she was qualified for the position she held.

Turning to the discrimination issue, the record evidence is sufficient to raise a genuine issue of material fact about whether Hayes discriminated against Harris on the basis of her disability when he replaced her as comptroller.[2] At his deposition, Hayes gave the following explanation for that decision: "I am thinking to myself in this big dilemma I am in right now, what do I do? If I put her in charge [as comptroller] ... then what if she has to go back to the hospital again, I am high and dry." Deposition of Aldric M. Hayes 29 (August 2, 1994). Moreover, as reviewed above, Hayes allegedly explained that he decided to replace Harris as comptroller because he "felt that the company was being put in jeopardy, at a disadvantage due to her type illness." One purpose of the ADA is to prevent employers from taking adverse employment actions against disabled employees because they merely "feel" that their businesses are being disadvantaged due to the disabilities of those employees, without first determining whether those disadvantages could be ameliorated with a reasonable accommodation that does not place an undue hardship on the business. *See* 42

---

[2]Although the Company contends that Harris cannot show discrimination, because she was not formally discharged, we note that the ADA provides protection against adverse employment actions that fall short of termination. *See* 42 U.S.C.A § 12112(a) (West 1995) (prohibiting discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms conditions, and privileges of employment"); *see also McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1078 (11th Cir.1996) (reversing jury verdict in favor of employer where verdict form erroneously limited recovery to "termination").

U.S.C. § 12112(b)(5)(A). The Company has not argued to us, or to the district court, that Harris' medical condition could not be accommodated without placing an undue hardship on the Company. Harris has met her burden at summary judgment on the issue of whether the Company discriminated against her on the basis of her disability.

## IV. CONCLUSION

The district court erred when it granted summary judgment to the Company on the grounds that Harris cannot show that she has a disability within the meaning of the ADA. The Company has failed to demonstrate the absence of genuine issues of material fact and that it is entitled to judgment as a matter of law on the issues of whether Harris actually has a substantially limiting impairment, as covered by 42 U.S.C. § 12102(2)(A), and as to whether the Company regarded her as having such an impairment, as covered by 42 U.S.C. § 12102(2)(C). Likewise, the Company has failed to demonstrate the absence of genuine issues of material fact as to whether Harris was qualified for the position of comptroller and as to whether the Company discriminated against her on the basis of her disability.

By contrast, the record is wholly devoid of sufficient evidence to demonstrate the existence of a genuine issue of material fact with respect to Harris' pendent state law claim for intentional infliction of emotional distress.

Therefore, we AFFIRM the entry of summary judgment in favor of the Company on the claim for intentional infliction of emotional distress, we REVERSE the entry of summary judgment in favor of the Company on the ADA claim, and we REMAND for further proceedings

consistent with this opinion.