**Glen ARNOLD, Plaintiff, Appellant,**

v.

**UNITED PARCEL SERVICE, INC., Defendant, Appellee.**

**No. 97–1781.**

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1997.

Decided Feb. 20, 1998.

---

Peter L. Thompson, Franfort, KY, with whom Law Offices of Ronald Coles, were on brief, for appellant.

Barbara L. Sloan, with whom C. Gregory Stewart, General Counsel, J. Ray Terry, Jr., Deputy General Counsel, Memphis, TN, Gwendolyn Young Reams, Associate General Counsel, Washington, DC, and Vincent J. Blackwood, Assistant General Counsel, Washington, DC, were on brief, for Equal Employment Opportunity Commission, amicus curiae.

Charles W. March, Sunenblick, Reben, Benjamin & March, Portland, ME, on brief, for American Diabetes Association, amicus curiae.

S. Mason Pratt, Jr., Portland, ME, with whom Catherine R. Connors, Brent G.T. Geraty, Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Portland, ME, were on brief, for appellee.

Loretta M. Smith, Winthrop, MA, on brief, for New England Legal Foundation, amicus curiae.

Before STAHL, Circuit Judge, ALDRICH and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

Glen Arnold brought this action against United Parcel Service, Inc. (UPS), alleging that UPS refused to hire him because of his disability, diabetes mellitus, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* The district court granted summary judgment to UPS, on the ground that Arnold had not shown that he had a disability and therefore was not protected by the ADA's antidiscrimination provision. In making its determination, the court considered Arnold's diabetes in its treated state, after taking into account the ameliorative effects of his insulin medication. Arnold appeals, arguing that such an analysis was legally.erroneous, inconsistent with the ADA and with the EEOC's interpretive regulations. He also argues that the facts he has introduced prove that he satisfies the statutory definition of an "individual with a disability," and that UPS has failed to demonstrate that it is entitled to judgment as a matter of law. UPS argues that the district court's analysis of Arnold's disability was proper, including its consideration of ameliorative medication. As an alternative ground for upholding the grant of summary judgment, UPS contends that federal regulations required it to deny Arnold's application for employment, and UPS is thereby entitled to judgment as a matter of law. We reverse and remand.

### Facts

Because this is an appeal from a grant of summary judgment in favor of defendant UPS, we state the facts in the light most favorable to the nonmovant, Arnold. *Dubois v. United States Dep't of Agriculture*, 102 F.3d 1273, 1284 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 2510, 138 L.Ed.2d 1013 (1997). Plaintiff–Appellant Glen Arnold has Type I insulin-dependent diabetes mellitus. As such, he is required to monitor his blood glucose levels throughout the day, and give himself injections of insulin two to four times a day. He is also required to pay constant attention to possible signs of hypoglycemia, and to follow a strict diet and exercise regimen to control the disease. His physician states that Arnold would die in the absence of his insulin injections. Arnold has successfully controlled his diabetes for twenty-three years.

In October, 1995, Arnold telephoned a human resources representative at UPS about

applying for the position of "cover mechanic." The position called for covering the shifts of night-time mechanics in four locations: Wells, Maine, and Dover, Laconia, and Twin Mountain, New Hampshire. Arnold had worked as an automotive mechanic for six years, and had obtained an associate degree in automotive technology.

After the initial phone conversation, Arnold met in person with both the human resources representative for UPS, Paul Tanguay, and with John Kennedy, UPS's fleet supervisor for its North New Hampshire division. By all accounts, both meetings went well. As a result, Kennedy indicated to Arnold that the job was his if he wanted it.

The next day, Arnold contacted Kennedy, and said that he wanted the job. The two agreed on an October 16, 1995 start date. Arnold was informed shortly thereafter that he would be required to pass a driving test, have his fingerprints taken, fill out additional paperwork, and submit to a Department of Transportation (DOT) physical.[1] On or about October 12, 1995, Arnold filled out the paperwork, was fingerprinted, and passed the driving test. He was then sent to a local health care facility, Seacoast Redicare, for the DOT physical. At the physical, Arnold, responding to a question from the physician, indicated that he was an insulin-dependent diabetic. The physician informed him that DOT regulations preclude insulin-dependent diabetics from obtaining the DOT certification required to operate commercial motor vehicles. On return to UPS, Tanguay informed Arnold that UPS could not hire him because he was unable to obtain DOT certification. Tanguay instead offered Arnold an alternate position, as a package "pre-loader," a position which provides substantially lower pay. Arnold did not respond to this alternate job offer.

Arnold instituted this action on October 9, 1996 in the United States District Court for the District of Maine under the ADA, 42 U.S.C. § 12101 et seq., and the Maine Human Rights Act, 5 M.R.S.A. § 4551 et seq. On March 14, 1997, after discovery had been completed, UPS filed a motion for summary judgment. On May 5, 1997, Magistrate Judge David Cohen submitted his Recommended Decision, ruling in favor of UPS on the grounds that, because Arnold's diabetes was effectively controlled by insulin injections, he was not disabled within the meaning of the ADA. On May 30, 1997, the district court (Hornby, J.) affirmed Magistrate Judge Cohen's recommendation, and entered judgment in favor of UPS. This appeal followed.

**I**

The district court determined that, as a matter of law, Arnold was not disabled within the meaning of the ADA, because his insulin-dependent diabetic condition did not substantially limit one or more of his major life activities.[2] The district court addressed the question of substantial limitation by analyzing Arnold's diabetic condition *after* he took his ameliorative medications, rather than analyzing his unameliorated diabetes. For the reasons that follow, we think this analysis was erroneous as a matter of law.

**A**

The "starting point for interpretation of a statute 'is the language of the statute itself.'" *Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 1575–76, 108 L.Ed.2d 842 (1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); *see Telematics Int'l, Inc. v. NEMLC Leasing Corp.*, 967 F.2d 703, 706 (1st Cir.1992). If

1. UPS requires all of its mechanics to acquire certification to operate commercial motor vehicles as ostensibly mandated by the United States Department of Transportation.

2. Arnold also sued under the Maine Human Rights Act. Because interpretation of the Maine Act has historically "proceeded hand in hand" with interpretation of the ADA, and because the ADA has "provided guidance to Maine courts in interpreting the state statute," *Soileau v. Guilford*

*of Maine, Inc.*, 105 F.3d 12, 14 (1st Cir.1997) (citing *Winston v. Maine Technical College Sys.*, 631 A.2d 70, 74 (Me.1993)), our resolution of the ADA claims, alleging unlawful discrimination and failure to make reasonable accommodations to Arnold's disability, will very likely dispose of Arnold's single state-law claim of disability discrimination, which we leave to the district court on remand.

the language of a statute "is plain and admits of no more than one meaning" and "if the law is within the constitutional authority of the law-making body which passed it," then "the duty of interpretation does not arise" and "the sole function of the courts is to enforce the statute according to its terms." *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *see also Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The plain meaning of a statute's text must be given effect "unless it would produce an absurd result or one manifestly at odds with the statute's intended effect." *Parisi by Cooney v. Chater*, 69 F.3d 614, 617 (1st Cir. 1995). Of course, we focus on "the plain meaning of the whole statute, not of isolated sentences." *Beecham v. United States*, 511 U.S. 368, 372, 114 S.Ct. 1669, 1671, 128 L.Ed.2d 383 (1994), and we interpret the statute's words " 'in light of the purposes Congress sought to serve,' " *Dickerson v. New Banner Inst., Inc.*, 460 U.S. 103, 118, 103 S.Ct. 986, 995, 74 L.Ed.2d 845 (1983) (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979)).

■ Thus, the district court is correct that we need not look into a statute's legislative history if the statutory language is plain, *see Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 610 (1st Cir.1995) ("Plain statutory language does not prompt recourse to countervailing legislative history."), at least in the absence of a "clearly expressed legislative intent to the contrary," [3] *Dickerson*, 460 U.S. at 110, 103 S.Ct. at 990 (internal quotation marks and citation omitted); *United States v. Caron*, 77 F.3d 1, 4 (1st Cir.1996). If the text is not unambiguously clear, however, we are obliged to turn to

other sources to discern the legislature's meaning. One important source, of course, is the legislative history. If that history reveals an unequivocal answer, we do not look to the interpretation that may be given to the statute by the agency charged with its enforcement. *Strickland v. Commissioner, Maine Dep't of Human Servs.*, 48 F.3d 12, 17 (1st Cir.1995) (applying the test of *Chevron*, 467 U.S. at 842–44, 104 S.Ct. at 2781–83). If the plain language and legislative history still leave some room for uncertainty about the statute's meaning, the court defers to the interpretation by an agency charged with enforcement of the statute, as long as that interpretation "flows rationally from a permissible construction of the statute." *Id.; see Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–82.

**B**

■ In the instant case, the statutory language is far from clear, particularly with respect to the key question in dispute here: should a court, in determining whether Arnold is "an individual with a disability," consider his *untreated* medical condition or his condition after treatment with ameliorating medications?

The ADA protects a qualified individual with a disability from discrimination in employment, among other things. 42 U.S.C. § 12112(a) (1994). The statute defines "disability" to mean "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1994). An individual must meet one of these three prongs in order to be covered under the ADA. If an individual is not "disabled" within

---

**3.** "[E]ven the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Thus, "[w]e have overridden literal language where it appeared inadvertent and undermined Congress' aim." *United States v. Estrella*, 104 F.3d 3, 8 (1st Cir.), cert. denied, —— U.S. ——, 117 S.Ct. 2494, 138 L.Ed.2d 1001 (1997) (citing *United States v. In-*

*delicato*, 97 F.3d 627, 629–30 (1st Cir.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1013, 136 L.Ed.2d 890 (1997)). Circuit courts have even held that a court should reject the literal meaning of a statute in favor of one which furthers congressional intent. *See Merz v. Secretary of Health & Human Servs.*, 969 F.2d 201, 205–7 (6th Cir.1992); *Sciarotta v. Bowen*, 837 F.2d 135, 138–39 (3d Cir.1988); *Swain v. Schweiker*, 676 F.2d 543, 546–47 (11th Cir.1982).

the meaning of one of the three prongs, the ADA does not protect that person against discrimination on the basis of his disability, and we need not proceed beyond this threshold issue to determine either whether any adverse action has been taken based upon the person's disability or whether the employer should have reasonably accommodated that disability.

The statute does not itself define the terms "impairment," "substantially limits," or "major life activity," all of which could have more than one meaning. In particular, the statute does not indicate whether medications, prosthetic devices, or other ameliorative treatments should be considered by a court in determining whether an individual suffers from an impairment and whether such impairment substantially limits a major life activity. "The statute certainly does not say 'impairment plus treatment' or 'impairment after treatment' or 'treated impairment'; it just says 'impairment.'" *Sicard v. City of Sioux City,* 950 F.Supp. 1420, 1436 (N.D.Iowa 1996). A reasonable person could interpret the plain statutory language to require an evaluation either before or after ameliorative treatment.

■ If Congress has not expressly defined a statutory term or phrase, a court should "normally construe it in accordance with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993); *see Telematics,* 967 F.2d at 706. But even as to the "ordinary or natural meanings" of the ADA's words, reasonable minds can differ, especially regarding whether ameliorative measures should be taken into account in determining whether an individual is disabled within the meaning of the ADA.

UPS argues that the statutory language plainly and unambiguously requires consideration of the impairment as treated with all ameliorative medications and other measures. In UPS's words, "substantially limits means substantially limits." But this formulation begs the question. The ambiguous issue is whether the ADA's reference to an "impairment" (which might or might not substantially limit a major life activity) means an impairment without treatment or an impairment after treatment. The word "impairment" could conceivably be read to mean "impairment after the underlying condition is treated with ameliorative therapy," which is essentially the way the district court interpreted it. Or the word could be read to mean "impairment that results from the underlying condition in the absence of any ameliorative treatment," as the EEOC and the Justice Department have read it. The statutory language, on its face, gives no clue as to which interpretation Congress intended. Certainly that language does not plainly and unambiguously refute Arnold's contention that his underlying medical condition—diabetes mellitus—constitutes an "impairment" that is protected by the ADA. Similarly, "[a]lthough the term 'substantially limits' may be unambiguous in and of itself, it nonetheless does not speak to the issue before [us]; that is, the statute is silent as to whether a substantial limitation is to be considered with or without regard to mitigating measures." *Wilson v. Pennsylvania State Police Dep't,* 964 F.Supp. 898, 904 (E.D.Pa.1997) (footnote omitted).

Thus, the plain language of the ADA is not so clear and unambiguous as the district court and UPS have characterized it, so we turn to other tools of statutory construction.

### C

We begin with the legislative history of the ADA. Both the explicit language and the illustrative examples included in the ADA's legislative history make it abundantly clear that Congress intended the analysis of an "impairment" and of the question whether it "substantially limits a major life activity" to be made on the basis of the underlying (physical or mental) condition, without considering the ameliorative effects of medication, prostheses, or other mitigating measures. For example, the House and Senate Committee reports explicitly state that, in determining whether an impairment substantially limits a major life activity, the impairment "should be assessed without considering whether mitigating measures, such as auxiliary aids or reasonable accommodations, would result in a less-than-substantial limitation." H.R.Rep. No. 101–485, pt. III, at 28

(1989), *reprinted in* 1990 U.S.C.C.A.N. 445, 451 (House Judiciary Report); *see* H.R.Rep. No. 101–485, pt. II, at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 334 ("House Labor Report") (The determination whether an individual has a "disability" within the scope of ADA coverage "should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids."); S.Rep. No. 101–116, at 23 (1989) ("Senate Report")(same).

Indeed, Congress spoke directly to the medical condition at issue in this case: "persons with impairments, such as epilepsy or diabetes, which substantially limit a major life activity," are considered to have an actual disability, "even if the effects of the impairment are controlled by medication." House Labor Report at 52; *see id.* at 51 (Although it is not possible to list *all* impairments covered by the ADA, "[t]he term includes ... diabetes."); Senate Report at 22 (same). These reports make it abundantly clear that Congress intended that the statutory definition of disability—an "impairment that substantially limits [a] major life activit[y]"—refers to the underlying medical condition, in this case Arnold's diabetes, without regard to whether "the effects of the impairment are controlled by medication." House Labor Report at 52.[4]

The district court focused on another statement in the Senate Report (contained in the Report's discussion of prong 3 but not contained in the House Reports):

> Another important goal of the third prong of the definition is to ensure that persons with medical conditions that are under control, and that therefore do not currently limit major life activities, are not discriminated against on the basis of their medical conditions. For example, individuals with controlled diabetes or epilepsy are often denied jobs for which they are qualified. Such denials are the result of negative attitudes and misinformation.

Senate Report at 24; *see Arnold v. United Parcel Serv., Inc.,* No. 96–294–P–H, slip op. at 13 (D.Me. May 5, 1997). Noting that this "speaks to the 'uncertainty' about the value of legislative history, and the attendant skepticism with which courts should view such documents," the district court relies on the above-quoted passage from the Senate Report to conclude that the EEOC's interpretation does not flow rationally from a "permissible construction of the statute." *Arnold,* slip op. at 13 (applying the test of *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781–82). The court reached this conclusion despite its recognition that "the need for deference to the agency's view 'looms large.'" *Id.* (quoting *Strickland,* 48 F.3d at 17). The district court reasoned that the Senate Report's allusion to uncontrolled diabetes in the context of prong three demonstrates that Congress did not intend uncontrolled medical conditions to be included in prong one of the definition of "disability." But the district court has no explanation for why the Senate Report had previously said, in its discussion of *prong one,* that the question "whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids." Senate Report at 23. Nor does the court explain why both House Reports and the Senate Report do not mean exactly what they say (evaluating "disability" *without* consideration of mitigating measures), especially since only the Senate Report made the supposedly significant statement limited to prong three.

Most significantly, this "prong three" passage in the Senate Report is not actually inconsistent with that report's prior language (identical with that of the House Report) stating that courts should focus on the untreated impairments: these passages can be easily squared by recognizing that an individual could have a "disability" under *both* prong one (having an impairment that substantially limits a major life activity) *and* prong three ("regarded as" having such an impairment) at the same time; one does not preclude the other. The ADA protects any individual with a "disability" against *both* discrimination based on prong one and discrimination based on prong three.

---

4. Both the House Labor Report, at 51–52, and the Senate Report, at 22, specifically list diabetes as an impairment under *prong one* of the ADA's definition of "disability."

## D

" 'As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve.' " *Dickerson*, 460 U.S. at 118, 103 S.Ct. at 995 (quoting *Chapman*, 441 U.S. at 608, 99 S.Ct. at 1911) (alteration in *Dickerson*); *see Caron*, 77 F.3d at 3–4. Thus, "[t]he definition of disability must be understood in light of congressional objectives in enacting the ADA." *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 14 (1st Cir.1997). The district court's interpretation of the ADA to require evaluation of an impairment like Arnold's diabetes only *after* ameliorative treatment such as insulin medication is inconsistent with those congressional objectives.

■■■■ The ADA is a "broad remedial statute." *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir.1997). It is a "familiar canon of statutory construction that remedial legislation," such as the ADA, "should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967). The fundamental purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (1994). In the context of employment discrimination, the thrust of this purpose is essentially to protect individuals who have an underlying medical condition or other limiting impairment, but who *are* in fact capable of doing the job, with or without the help of medications, prosthetic devices, or other ameliorative measures, and with or without a reasonable accommodation by the employer. *See, e.g.,* 42 U.S.C. § 12101(a)(7) ("individuals with disabilities ... have been faced with restrictions and limitations, [and] subjected to a history of purposeful unequal treatment, ... based on characteristics that

are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society").[5] The ADA protects such individuals from discriminatory actions by some employers who might erroneously believe the individual's medical condition renders her unable to do the particular job for which she has applied, or who might harbor an irrational prejudice against people suffering from such medical conditions. *Cf. School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284–86 & n. 13, 107 S.Ct. 1123, 1129–30 & n. 13, 94 L.Ed.2d 307 (1987) (discussing the purpose of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1994)).

Conceptually, it seems more consistent with Congress's broad remedial goals in enacting the ADA, and it also makes more sense, to interpret the words "individual with a disability" broadly, so the Act's coverage protects more types of people against discrimination. Even with such a broad view of "disability," the concerns and interests of employers are still amply protected through the Act's other provisions. For example, the individual with a disability who seeks a job must still be "qualified," i.e., able to perform the essential functions of the job. 42 U.S.C. §§ 12111(8), 12112(a) (1994). Additionally, if an accommodation is required in order to enable the individual to perform some of those job functions, we will examine the reasonableness of that accommodation, including its cost and other burdens on the employer's business operations. 42 U.S.C. § 12111(9), (10); *see also Arline*, 480 U.S. at 285, 107 S.Ct. at 1129 ("[T]he definition of 'handicapped individual' [in § 504 of the Rehabilitation Act] is broad, but only those individuals who are both handicapped *and* otherwise qualified are eligible for relief.").[6]

---

5. *See also id.* § 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem"); § 12101(a)(3) ("discrimination against individuals with disabilities persists in such critical areas as employment"); § 12101(a)(5) ("individuals with disabilities continually encounter various

forms of discrimination, including outright intentional exclusion, the discriminatory effects of ... exclusionary qualification standards and criteria, segregation, and relegation to lesser ... jobs").

6. We use case law under § 504 of the Rehabilitation Act for guidance in interpreting the ADA. *EEOC v. Amego, Inc.*, 110 F.3d 135, 143 (1st Cir.1997)(citing 42 U.S.C. § 12117(b)).

The structure of the Act supports this conceptual distinction: the term "disability" is defined in § 12102, a general section applicable to all subchapters and to all areas. The Act thus covers all "disabled" individuals and protects their rights to the extent defined in each subchapter. The terms "qualified" and "reasonable accommodation" are defined in § 12111, limited to "Subchapter 1—Employment." This particular subchapter defines and limits the substantive rights and responsibilities of employers and employees (or applicants for employment), balancing the interests of each, in furtherance of the purposes of the Act, within the particular context of employment.

UPS argues that, were we to accept a broad definition of "individual with a disability" (i.e., if we examine the definition without considering ameliorative measures), then an unacceptably large percentage of the population will fall within the protective umbrella of the ADA. But that is what Congress intended. The very first finding Congress listed in the preamble to the Act is that "some 43,-000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older." 42 U.S.C. § 12101(a)(1). It thus appears that Congress not only considered but actually intended that the ADA's protections sweep broadly, covering a significant portion of the American populace.

One example that demonstrates how UPS's interpretation of the statute would be inconsistent with the Act's broad remedial purposes was pointed out by the EEOC in its amicus brief. Under UPS's interpretation, someone who could not afford treatment for his impairment would be protected by the ADA from discrimination in hiring. But once he was hired and obtained treatment under the employer's health plan, he would lose the ADA's protection because he would no longer be "disabled." The employer could then fire him on the basis of his disability without fear of the protective consequences embodied in the ADA. UPS argues that "[t]his is simply not true; such conduct would be the very sort of situation the 'regarded as' prong was designed to cover." Even if such conduct were covered under

prong three, that would not mean the same conduct is not also covered under prong one. Indeed, the House Report specifically mentions "persons with impairments, such as epilepsy or *diabetes,* which substantially limit a major life activity" and says that they are "covered under the *first* prong of the definition of disability, even if the effects of the impairment are controlled by medication." House Report at 52 (emphasis added); *see* Senate Report at 22. There is no reason this employee could not be protected under two prongs simultaneously. In light of the broad remedial purposes of the ADA, *see Penny,* 128 F.3d at 414, we believe Congress intended the Act to prohibit such a termination under prong one.

Similarly, UPS's reading would treat differently a plaintiff like Arnold (who takes his medications and thus would not be protected by the ADA, according to UPS) and a plaintiff who is also diabetic (i.e., suffering from the same medical condition as Arnold) but who cannot afford to take his medications. The latter plaintiff would be protected by the ADA according to UPS's analysis, but Arnold would not. We do not think Congress intended such an anomalous result.

Arnold's diabetes makes him just the type of person the ADA was designed to protect. He would have been hired by UPS but for his inability to get a commercial vehicle license, which was prevented only because he had diabetes (the underlying medical condition, without taking into account ameliorative treatment). But Arnold alleges that, with treatment, he can perform the job despite his impairment if UPS will reasonably accommodate him. This would ordinarily be a factual question on the merits for the court to determine. Yet under UPS's and the district court's interpretation of the ADA, a person in this archetypical situation is not protected from discrimination by the ADA because he is not disabled and hence not even a proper plaintiff under the Act. According to UPS, in such circumstances, the trier of fact never gets to the merits of the alleged discrimination, of the "qualified individual" requirement, or of reasonable accommodation.

UPS's interpretation fails because, by "confus[ing] the disease with its treatment,"

*Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 937 (3d Cir.1997), it conflates two separate parts of the ADA. The determination as to whether an individual is "disabled" is a threshold issue; if one is not disabled, then one is not protected by the ADA against discrimination. *See Soileau,* 105 F.3d at 15. Once a person is determined to be covered by the ADA, then that person has a right not to be discriminated against in employment (inter alia) on the basis of her disability, as long as she is qualified for the job, with or without a reasonable accommodation. Were we to adopt UPS's position in this case, a plaintiff would have to prove that she is "substantially limited" even with ameliorative medication—and therefore possibly unable to perform some of the essential elements of the job—in order just to be covered by the ADA's protective umbrella. Thus, under UPS's interpretation, the employer could avoid liability for discrimination by excluding the plaintiff from the ADA's coverage, without giving the applicant an opportunity to show that she is qualified for the job (with or without a reasonable accommodation), with ameliorative medication. *See* Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis and Implications of a Second–Generation Civil Rights Statute,* 26 Harv. C.R.-C.L. L.Rev. 413, 448 (1991) (describing this as a "Catch–22 situation").

All of the policy concerns that UPS raises in its brief can be addressed in the discrimination determination, i.e., the determination of whether the plaintiff is otherwise qualified for the job or can be made so with a reasonable accommodation. UPS will have every opportunity to demonstrate that Arnold is unable to perform one or more of the essential functions of the job. Indeed, the burden will be on Arnold to demonstrate that he is qualified for the job. UPS will also be free to try to show that any accommodations Arnold needs would be too expensive or otherwise too burdensome to be considered "reasonable." But none of UPS's articulated concerns are applicable at the threshold stage where the court is determining whether the individual is disabled and therefore protected by the ADA in the first place. Thus, contrary to UPS's reading, the ADA's definition of "disability" is most consistent with the broad purposes of the statute if Arnold's impairment and its effects are evaluated in their untreated state, without the ameliorative effect of medications on his underlying medical condition.[7]

 Evaluating the statutory language of the ADA in light of the legislative history and the broad remedial purposes of the Act, we conclude that Congress intended a reviewing court to evaluate Arnold's disability based on his underlying medical condition without considering the ameliorative effects of his insulin medication. The district court erred in holding to the contrary.

**E**

 Even if the legislative history were not clear on this point, the court also erred in failing to afford adequate consideration to the similar interpretation set forth by the EEOC in its guidelines. The ADA authorizes—indeed "requires"—the EEOC to "issue regulations in an accessible format to carry out" the Act. 42 U.S.C. § 12116 (1994). Pursuant to that authority, the EEOC has promulgated regulations, attached to which as an appendix it has compiled guidelines for interpreting the statute. According to those guidelines, the determinations of whether an individual has an "impairment" and whether that impairment "substantially limits a major life activity" should be made "on a case by

---

7. UPS's interpretation could very well produce results antithetical to its expressed concerns and to the Act's attempt to take such concerns into account. That a person with a disability is able to use medical knowledge or technology to overcome many of the effects of his illness (in Arnold's case, by a continuing regimen of medicine, proper eating habits, and rest) may mean that he will, in practice, rarely require any sort of accommodation from his employer; but his achievement should not leave him subject to discrimination based on his underlying disability. He should not be denied the protections of the ADA because he has independently taken the initiative and successfully brought his diabetes under control. It is hard to imagine that Congress wished to provide protection to workers who leave it to their employer to accommodate their impairments but to deny protection to workers who act independently to overcome their disabilities, thereby creating a disincentive to self-help.

case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." EEOC Interpretive Guidance, 29 C.F.R. Part 1630, App. §§ 1630.2(h) (1997) (physical impairment) and 1630.2(j) (substantially limits) (noting that "a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication" (citing Senate Report at 23; House Labor Report at 52)).

 We recognize that the EEOC interpretive guidelines are not controlling in the way that regulations promulgated pursuant to the Administrative Procedure Act, 5 U.S.C. § 552, are controlling.[8] Nevertheless, such interpretive guidelines " 'do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.' " *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986) (quoting *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141–42, 97 S.Ct. 401, 410–11, 50 L.Ed.2d 343 (1976)); *Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 673 (1st Cir.1995). They deserve at least as much consideration as a mere "internal agency guideline," which the Supreme Court has held is entitled to "some deference" as long as it is a permissible construction of the statute. *Reno v. Koray,* 515 U.S. 50, 61, 115 S.Ct. 2021, 2027, 132 L.Ed.2d 46 (1995); *see also Commonwealth of Mass. v. F.D.I.C.,* 102 F.3d 615, 621 (1st Cir.1996) (holding that even something as informal as "[a]n established administrative practice interpreting a statute" or "a new policy . . . announced in a . . . presentation by one of the [agency's] staff attorneys at a conference" "may be entitled to deference," although "something less than full *Chevron*

deference," even if the administrative practice or new policy is "not yet reduced to specific regulation" (citing *F.D.I.C. v. Philadelphia Gear,* 476 U.S. 426, 439, 106 S.Ct. 1931, 1938–39, 90 L.Ed.2d 428 (1986))).

The EEOC's interpretation is not merely "permissible"; it is entirely consistent with the ADA's legislative history and broad remedial purposes. *See supra* at Parts C and D. Moreover, this court has previously "looked to" the same body of EEOC Interpretive Guidance that is at issue here, 29 C.F.R. Part 1630, App. § 1630, to illuminate our efforts to "interpret[ ] the ADA."[9] *Grenier,* 70 F.3d at 672; *see Carparts Distrib. Ctr. v. Automotive Wholesaler's Ass'n, Inc.,* 37 F.3d 12, 16 (1st Cir.1994). In addition, the reasonableness of the EEOC's interpretation is bolstered by a virtually identical interpretation by the United States Department of Justice, which is charged with enforcing the ADA's prohibition of discrimination based on disability on the part of state and local governmental entities. *See* 28 C.F.R. Part 35, App. A § 35.104 ("disability should be assessed without regard to the availability of mitigating measures").

Defendant UPS claims that the EEOC's interpretation (and, inferentially, the Justice Department's) reads the words "substantially limits" out of the statute. The Eleventh Circuit rejected this argument in *Harris v. H & W Contracting Co.,* 102 F.3d 516, 521 (11th Cir.1996), and so do we. UPS's argument essentially begs the question. The key question is whether the statutory word "impairment" refers to treated or untreated impairments. The "substantially limits" requirement pertains to the impairment referred to in the first part of the definitional

8. Under *Chevron,* 467 U.S. at 842–44, 104 S.Ct. at 2781–83, unless the plain language of a statute (or that language viewed in light of the legislative history) is clear, courts will defer to an interpretation of the statute by the agency charged with its enforcement if the agency's interpretation is "a permissible construction" of the statute's language and legislative history. *Id.* at 843, 104 S.Ct. at 2781–82. A permissible construction is one that is not "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. "The court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the

construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n. 11, 104 S.Ct. at 2782 n. 11 (citing *FEC v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981)).

9. UPS itself relies on a different section of the same EEOC Interpretive Guidance, 29 C.F.R. Part 1630, App. § 1630.15(e), in making its argument that the district court decision should be affirmed for a different reason than the court gave.

sentence, regardless of whether that impairment is read to mean the condition in its treated or untreated state. Thus, far from reading that requirement out of the statute, the EEOC's interpretive guideline helps to clarify an ambiguity in the statute, and places the statutory words "substantially limits" in proper relation to the impairment. The guideline reads "substantially limits" as referring to the untreated impairment rather than the treated impairment. The trier of fact must still decide whether the untreated impairment "substantially limits" any major life activity before the untreated impairment constitutes a "disability" within the meaning of the ADA. This is a permissible reading of the ambiguous statutory language. *Id.* Surely, nothing in the language of the Act rules out this approach. Indeed, as noted *supra*, at least with respect to insulin-dependent diabetes mellitus, Congress appears to have had such an interpretation specifically in mind. *See* House Labor Report at 51–52; Senate Report at 22–23.

UPS further argues that the EEOC "must be saying" that a person taking insulin is *per se* significantly restricted. This claim is also meritless. Nowhere does the EEOC interpretive guideline say that any particular medical condition would *per se* be treated as a disability or that any similar *per se* rule should apply. On the contrary, the EEOC regulations and guidelines emphasize the requirement that every person's situation be treated individually. *See* Appendix to Part 1630, "Background" (observing that "[t]his case-by-case approach is essential"); 29 C.F.R. Part 1630, App. § 1630.2(j) (Determinations of "impairment" and "substantial limit[ation]" should be made "on a case by case basis."); *id.* ("Some impairments may be disabling for particular individuals but not for others."). Again, the only question before us is whether the impairment whose effects are evaluated in this case-by-case approach is the treated or the untreated medical condition.

UPS's argument blurs the distinction between our analytical process or methodology, on the one hand, and the substantive conclusion that results from that process. The EEOC's reading of the statute does not become a *per se* rule simply because, when an individualized evaluation is applied to individuals who have a particular medical condition, the result will almost always turn out to be the same. For example, even under UPS's reading of the statute, virtually all quadriplegics will probably be found to qualify as "individuals with disabilities" under the ADA, but this result does not mean courts are applying a *per se* rule rather than an individualized analysis.

**F**

Finally, the majority of federal circuit courts that have considered this issue have followed the EEOC interpretation that ameliorative measures should not be considered in determining whether an impairment substantially limits an individual's major life activities. *See Matczak,* 136 F.3d at 936–37; *Doane v. City of Omaha,* 115 F.3d 624, 627–28 (8th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998); *Harris,* 102 F.3d at 520–21 (reviewing legislative history and concluding that the EEOC Interpretive Guidance is a permissible construction of the statute); *Holihan v. Lucky Stores, Inc.,* 87 F.3d 362, 366 (9th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1349, 137 L.Ed.2d 506 (1997); *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir. 1995). *But see Sutton v. United Air Lines,* 130 F.3d 893, 902 (10th Cir.1997); *Gilday v. Mecosta County,* 124 F.3d 760, 767 (6th Cir. 1997) (Kennedy, J., concurring in part and dissenting in part); *id.* at 768 (Guy, J., concurring in part and dissenting in part); *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 191 n. 3 (5th Cir.1996) (dicta).

UPS argues in its brief that these courts did not really follow the EEOC interpretation of the law but rather "merely acknowledged the existence of the EEOC guidelines." UPS is simply wrong. *Matczak, Doane, Roth,* and *Harris* do not merely "acknowledge" the "existence" of the guidelines. They state a principle of law—that ameliorative medications are not to be considered in determining whether an individual is disabled and therefore protected by the ADA from discrimination—and then cite the EEOC guidelines as one ground in support of this

principle. *See Matczak,* 136 F.3d at 936–37; *Doane,* 115 F.3d at 627 (stating that "analysis of whether [plaintiff] is disabled does not include consideration of mitigating measures"); *Roth,* 57 F.3d at 1454; *Harris,* 102 F.3d at 521 (concluding that the EEOC's interpretation is "firmly rooted in the ADA's legislative history").

UPS is correct that the *Harris* court, in reaching the same conclusion, applied full *Chevron* deference to the EEOC's guidelines, rather than the lesser degree of deference that *Meritor* requires for interpretive rules that have not undergone the full APA promulgation process. *See Meritor,* 477 U.S. at 65, 106 S.Ct. at 2404–05; *see also supra* at 22. But the conclusion in *Harris* remains valid, including its determination that the EEOC's interpretation of the ADA is a permissible one. UPS has no persuasive rebuttal to the lesser degree of deference that we have applied pursuant to *Meritor*—giving *some* consideration to the EEOC's interpretation. Like the *Harris* court, we find the EEOC's interpretation to be consistent with the ADA's legislative history, as outlined *supra,* and with the overall protective purpose of the ADA; the interpretation is therefore permissible.

■ We conclude, therefore, that the ADA protects Arnold from discrimination if he is disabled based on his underlying medical condition, without regard to whether some of his limitations are ameliorated through medication or other treatment. This holding is based on the facts of this case and is limited to the condition presented here, namely diabetes mellitus. We venture no opinion as to whether we would reach the same conclusion if other medical conditions or other facts were presented.[10] We conclude in this case that the EEOC's guidelines are worthy of consideration and that Arnold's

diabetes, in its untreated state, is a disability protected from discrimination by the ADA.[11]

The judgment of the district court is *reversed,* and the case is *remanded* for further proceedings consistent with this opinion. Costs on appeal are awarded to Arnold.

---

10. For example, we might reach a different result in the case of a myopic individual whose vision is correctable with eyeglasses. The availability of such a simple, inexpensive remedy, that can provide assured, total and relatively permanent control of all symptoms, would seem to make correctable myopia the kind of "minor, trivial impairment[ ]," Senate Report at 23, that would not be considered a disability under the ADA.

11. Arnold argues that, even looking at his condition after amelioration, his impairment substantially limits his ability to engage in a number of major life activities. We need not address this question, because we have held that the appropriate analysis under the ADA is to evaluate his impairment's limiting effects without regard to ameliorative medication and treatment.