**Eric F. ADAMS, Plaintiff,**

v.

**Cal HENDERSON, Sheriff of Hillsborough County, in his Official Capacity and Hillsborough County Sheriff's Office, Defendants.**

No. 97–2966–CIV–T–17E.

United States District Court,
M.D. Florida,
Tampa Division.

April 23, 1999.

David S. Shankman, Ann Snow, Newman, Levine, Metzler & Shankman, P.A., Tampa, FL, for Eric F. Adams, plaintiff.

Thomas M. Gonzalez, Arnold B. Corsmeier, Kelly L. Soud, Thompson, Sizemore & Gonzalez, P.A., Tampa, FL, Frederick Carrington, Carrington & Carrington, P.A., Clearwater, FL, for Cal Henderson, Sheriff of Hillsborough County, defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, Chief Judge.

This cause comes before the Court on Defendants CAL HENDERSON and HILLSBOROUGH COUNTY SHERIFF'S OFFICE's motion for summary judgment and supporting memorandum (Docket No. 13), filed December 14, 1998; the depositions of Eric Adams, Daron Diecidue, and David M. Parrish (Docket Nos. 15–17), filed December 14, 1998; Plaintiff ERIC F. ADAMS' response and exhibits (Docket No. 21), filed January 22, 1999; and the amended exhibits to Plaintiff's response (Docket No. 22), filed January 25, 1999.

### STANDARD OF REVIEW

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A material fact is one which "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The evidence presented must be construed in favor of the non-moving party, and that party must receive the benefit of all favorable inferences that can be drawn from that party's evidence. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Evans v. Meadow Steel Products, Inc.,* 579 F.Supp. 1391, 1394 (N.D.Ga.1984). The Court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial, summary judgment should be granted. *See Jones v. Gerwens,* 874 F.2d 1534, 1538 (11th Cir.1989) (citing *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548).

### BACKGROUND

This case arises under the American with Disabilities Act, 42 U.S.C. § 12101 *et seq.* [ADA]. The facts as stated are taken from the depositions, exhibits, and affidavits in the record. Where there are conflicts in the evidence, they are resolved for purposes of this motion in favor of Adams as the non-moving party.

Adams began working for Defendants in April 1992. He worked as a Detention Deputy at the Orient Road Detention Facility [hereinafter "Orient Road"] in Hillsborough County, Florida. He worked in a unit that is considered a high risk area of Orient Road, because it houses death row inmates and people on psychotropic medications. His job required him to supervise inmates, including supervising inmate cleaning crews. It also occasionally required him to run in response to an emergency, and on a few occasions during his time at the detention facility, he had to physically restrain prisoners in an altercation. During Adams' time as a Detention Deputy, he received uniformly positive evaluations, and in those evaluations and their deposition testimony, his supervisors describe him as a dependable, conscientious, and professional employee.

On the morning of December 26, 1992, Adams was at home after having worked the night shift at Orient Road. Maintenance personnel from the apartment com-

plex in which he lived arrived to do repairs in the bathroom of his apartment. Adams let them in and went to sleep. The work they did caused debris, which clogged the drain in his bathtub. The workers poured a full bottle of a sulfuric acid solution into the clogged bathtub and left the apartment while Adams slept. Fumes from the solution permeated the apartment to the point that the rotten-egg odor characteristic of sulfuric acid was noticeable outside the apartment.

Apparently overcome by the fumes, Adams did not awaken, even though a neighbor pounded on his door, until his wife arrived home. Alarmed by the fumes and unable to awaken her husband, Adams' wife carried him out of the apartment. At that point, Adams had been in the apartment for an estimated forty-five minutes to two hours after the sulfuric acid solution was poured. He was groggy, his lips were blue, and copious amounts of mucus were draining from his nose. Adams returned to the apartment, opened the windows and doors to allow the fumes to dissipate, entered the bathroom, and used a plunger to attempt to remove the clog from the bathtub drain.

Following his exposure to the sulfuric acid fumes, Adams developed a severe cough and began coughing up blood. About a week after the incident, he began experiencing wheezing, chest pain, and bronchitis-like symptoms. Although he had previously been accustomed to strenuous exercise, he was unable to engage in it any longer. A few weeks later, he began to notice that such things as perfumes, cleaning solutions, cigarette smoke, and certain foods caused wheezing.

Adams consulted Dr. David Goldstein, a pulmonologist. Dr. Goldstein diagnosed him as having Reactive Airways Disfunction Syndrome [RADS], a condition similar to asthma that is caused by high levels of exposure to chemical irritants. In persons with this syndrome, exposure to chemical, infectious, or other environmental irritants can cause the airways to go into spasm.

Symptoms include difficulty breathing, coughing, wheezing, tightness in the chest, and bluing of the lips. In extreme cases, the airway spasms symptomatic of RADS can lead to hospitalization or death if left untreated. That diagnosis has since been confirmed by another specialist, Dr. Stuart Brooks. Dr. Goldstein prescribed a steroid inhaler, a bronchial dilator, and a course of antibiotics.

Adams continued to work at Orient Road. However, due to the large number of prisoners, the jail is continuously being cleaned. Adams began to notice that his condition worsened when he worked a great deal, and particularly when he supervised inmates on cleaning details. Following the shifts during which he supervised cleaning, he developed bronchitis-like symptoms, including coughing, fluid in his lungs, and difficulty breathing.

Although he noticed the correlation between exposure to fumes from cleaning solutions and the onset of symptoms, Adams initially said nothing to his employer abut his condition, or the effect the chemicals had on it, because he was afraid of losing his job. However, in early 1994, Adams was switched from the evening shift to the night shift. During that shift, the entire jail is cleaned, and he was required to regularly supervise cleaning details. Because of the symptoms caused by Adams' exposure to the chemicals used to clean the jail, he had to take several sick days. In late May of 1994, Adams returned after having taken a sick leave, and his supervisor asked him why he had been taking so much sick time recently. Adams told him about his condition, and that his supervision of cleaning crews was exacerbating the condition. Adams was told he could not return to work until he provided a doctor's note explaining what limitations his condition placed on him. Adams' supervisor told his superiors about Adams' condition.

Adams provided Captain Lucas, at the time the light duty coordinator of the

Sheriff's Office, with a note from Dr. Goldstein stating that Adams should not be exposed to large particulate dust, such as sawdust, or volatile chemicals. Adams told Captain Lucas that he wanted to go back to work. Captain Lucas told Adams that there was nothing he could do for Adams, because he couldn't go back to his job, and there weren't any jobs to which he could refer Adams. Adams agreed that there was no way he could continue to serve as a Detention Deputy. Even if he were not supervising cleaning crews, there was ongoing cleanup at the jail. He would be exposed to cleaning chemicals to some degree or another at any location within Orient Road, during any shift.

Captain Lucas suggested Adams speak with Rosa Cambridge, the medical coordinator for the Sheriff's Office. Adams called her the next day. He told her of the difficulties he experienced when he is exposed to chemical irritants, and particularly, when he exerted himself physically while in the presence of strong chemicals. By the time of that meeting, Adams had recovered sufficiently that he was able to exercise, including running, so long as he had not been exposed to chemicals. Cambridge told Adams he would have to speak with Captain Lucas. Captain Lucas again told Adams that there was nothing he could do for Adams, and suggested that Adams speak with Colonel Parrish, the Detention Department Commander for the Hillsborough County Sheriff's Office, who is in charge of the jail system.

On Cambridge's advice, on June 20, 1994, Adams requested a medical leave of absence. The written request explained how his medical condition came about, and that as a result of this disability, he was unable to carry out his duties as a Detention Deputy. Adams stated that "[e]xposure to strong vapors from cleaning solvents such as floor stripper, floor wax, oil based paints and disinfectant sprays has set of my asthma while supervising inmates cleaning jail areas," and that such exposure had led to acute bronchitis on several occasions. He also stated that his asthma had become acute when he had had to run in response to emergencies within the jail, to the point that he had required medication.

Adams also met with Colonel Parrish, and explained his condition, and the limitations it placed on him. He asked Colonel Parrish if there were any jobs that he might be able to fill in the Sheriff's Office. Colonel Parrish and Adams examined the list of open positions within the detention department. The only position Colonel Parrish suggested was a Community Service Officer position at the front desk at Orient Road. Adams expressed his interest in the position. However, Colonel Parrish pointed out that the cleaning crews cleaned that area continuously, as well. Colonel Parrish told Adams that there was nothing he could do for him.

Adams received no immediate response to his request for a medical leave of absence. Frustrated at the lack of response, Adams continued to call Colonel Parrish and ask for his help. Colonel Parrish finally told him to meet with Fred Carrington, the Sheriff's legal counsel. He met with Carrington in July, and explained the situation to him. Adams said he needed an answer one way or the other, because he needed to either get back to work or file for unemployment.

The letter Adams received from Carrington stated that Carrington had spoken to Colonel Parrish, and that "at the present time we will be unable to place you within our office, as there are no positions available." At that point, Adams filed for unemployment. When the state sent a notice to the Sheriff's Office, the Sheriff's Office replied that Adams was still employed with them and should not get unemployment benefits. However, when Adams provided the unemployment office with the letter from Carrington, the unemployment office found that by their standards, he was unemployed.

Adams continued to call Defendants regarding his request for medical leave. Neither the personnel department nor the payroll department was able to tell him the status of his request or who was handling it. Finally, on November 21, 1994, Adams called the payroll department to inform Defendants of problems he was having with his health insurance. Adams spoke to Corporal Lawton, who told him then that his request for a medical leave of absence was retroactively approved.

On the same day that Adams was informed that his medical leave request had been granted, Defendants mailed Adams a letter informing him that his medical leave would expire on January 4, 1995, and that his failure to report to work on that date "capable of performing all essential functions of [his] job classification, ... w[ould] result in [his] being considered as absent without leave and may result in [his] discharge." He was informed that if his physician determined that he would be unable to return his job when his medical leave expired, he should call Civil Service and determine whether there were any positions available with the Sheriff's Office the duties of which he could perform. The letter also stated that a determination as to whether accommodation was possible had to be made before his medical leave expired. It said that if he did not return to his position on January 4, 1995, a due process hearing was scheduled for January 12, 1995 regarding his "termination for failure to return to duty at the end of an authorized absence."

Adams called Civil Service and found out that a position as a Community Service Program Coordinator position was available. The position entailed researching and writing grant applications and setting up programs within the community to support law enforcement. It was essentially an office job that would require no exposure to chemicals or large particulate dust. The day after he received the letter from Defendants, Adams spoke to the office of Colonel Lawton, the administrative corporal to the head of the administration department of the Sheriff's Office. Adams had left Colonel Lawton a note stating that he was interested in and qualified for the Program Coordinator position. Colonel Lawton called Adams to ask whether Adams could do the job.

The following day, Adams turned in his application for the position. On December 5, 1994, Civil Service sent Adams notification that he did not have the minimum qualifications for the Program Coordinator position because he did not have experience with researching and writing grant applications. Adams met with Mercedes Sierra of the Civil Service Board and learned that Civil Service had apparently lost the information he had provided regarding his experience in the relevant area. On December 15, 1994, Adams was sent notice that he qualified for the Program Coordinator position, and would be placed on the eligible list for that position.

Requiring Adams to qualify with Civil Service for the Program Coordinator position was consistent with the Hillsborough County Civil Service rules and regulations. These regulations are intended to ensure that employees are not preselected. They require that before a person can obtain a position with Hillsborough County, that person must qualify for the position with Civil Service. Once a person has qualified for a position, that person's name is placed on a list. A position can only be filled from the list of people qualified for that position. Even a person who is already a county employee cannot transfer to another position without being on the list of persons qualified for that position.

After Adams received notice from Civil Service that he had qualified for the Program Coordinator position, he called Corporal Lawton to inform him of his qualification. Corporal Lawton told Adams that he would have to compete for the position along with everyone else who applied for it.

On December 19, 1994, Adams wrote a letter to Defendant Sheriff Cal Henderson. He explained his condition, and described his meetings and conversations with employees of the Sheriff's Office up to that point. He stated that he had applied and qualified for the Program Coordinator position, and that his physician had approved a fitness for duty report for that position. He asked to be placed in the Program Coordinator position. Defendants made no response to this letter.

A board of three persons was chosen to interview the candidates and select the Program Coordinator. The committee selected another applicant for the Program Coordinator position. Using a selection committee is not the procedure that the Sheriff's Office uses to fill most positions, but it was used with that job opening because the Program Coordinator position was considered an important position. With most positions, if an already existing employee was on the list of persons for a position, the Sheriff's Office could "give the nod" to that applicant. Defendants' corporate representative explained at his deposition it was his philosophy and the policy of their agency that if one of their employees who is injured or disabled is on the qualified list for a "pool position," that is, one that is not filled by a selection committee, he would encourage selecting that person. He stated: "[T]hey're all basically generally qualified. There may be 40 people on the list, and I would encourage picking our employee. They're already our employee. They've demonstrated they've done a good job. They've just got a bad knee, but they physically can perform say that job of secretary." Deposition of Daron Diecidue at 43. However, Defendants do not tell employees of this policy, and Adams was not aware of it.

During the time period from June 1994 to February 1995, Adams was unaware of any vacant jobs the duties of which he could have performed despite his condition. In fact, there were numerous such vacant positions at that time, including Community Service Officer, Digital Communications Dispatcher, Process Server, Fingerprint Technician, Storekeeper, and Clerk positions. The qualifications of these positions were such that Adams would have qualified for any of them.

On January 12, 1995, Defendants conducted a due process hearing to determine whether Adams' employment would be terminated. He was given a non-disciplinary dismissal, effective February 1, 1995, for "failure to return to duty at the end of an authorized absence."

Adams now works for the City of St. Petersburg as a police officer. Before he began the position in St. Petersburg, he worked for the Department of Defense for two years as a police officer at the Aberdeen Improving Ground in Maryland. His job does not require exposure to chemicals that affect his condition. He has not had problems running or in emergency situations.

Once his continual exposure to chemicals ended, his condition improved considerably. He reports that as long as he limits his exposure to chemicals that affect him, he has few problems. However, when he is exposed to irritants such as cleaning solutions, bleach, or materials with strong odors, his breathing is impaired. Such chemicals are often used in public places, such as grocery stores, malls, and retail stores. When he is exposed to such chemicals indoors, he immediately leaves the premises, because otherwise he develops symptoms of RADS.

Adams filed a discrimination charge with the Equal Employment Opportunity Commission [EEOC]. The EEOC investigated and found cause to believe that Defendants had violated the ADA. The EEOC attempted informal conciliation, but Defendants refused all conciliation efforts. The EEOC issued a right to sue letter on September 15, 1997, and Adams timely filed suit.

## ANALYSIS

■ The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees." 42 U.S.C. § 12112(a). The Eleventh Circuit has stated that the elements of an ADA claim are that:

(1) [the plaintiff] has a disability;

(2) [the plaintiff] is a qualified individual; and

(3) [the plaintiff] was subjected to unlawful discrimination because of [his] disability.

*Morisky v. Broward County,* 80 F.3d 445, 447 (11th Cir.1996). Defendants argue that no genuine issue of material fact remains with regard to any of these elements of Adams' claim, and that they are entitled to summary judgment as a matter of law.

### I. Disability

Defendants argue that Adams is not disabled within the meaning of the ADA. The ADA defines "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12101(2). Plaintiff has provided unrebutted evidence showing that he had a disability under the first of these definitions.

There is no dispute that Adams' condition was an impairment within the meaning of the ADA. *See* 29 C.F.R. § 1630.2(h)(1) (including within the definition of "impairment" physiological disorders affecting the respiratory system). Defendants argue, however, that Adams' impairment did not substantially limit any major life activity. The term "major life activities" is defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An impairment "substantially limits" a person if it makes the person:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). Adams argues that his condition substantially limits him in the major life activities of breathing and working.

### A. Breathing

■ Defendants deny that Adams' condition substantially limited him in the major life activity of breathing. They assert that the record evidence shows only that Adams "had an asthmatic reaction upon exposure to industrial strength chemicals, to which the average person is not ordinarily exposed." The factors to "be considered in determining whether an individual is substantially limited in a major life activity" are as follows:

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). Contrary to Defendants' assertions, when considered in terms of these factors, the record shows that Adams had an impairment that substantially limited him in the major life activity of breathing.

First, the "nature and severity" of Adams' condition is such that he can expect a potentially life-threatening reaction

to many chemicals that the ordinary person might encounter on a daily basis. The record shows that Adams' ability to breathe is compromised upon exposure to many chemicals that the average person might expect to encounter regularly, including floor wax, disinfectant spray, cleaning solutions, bleach, and even perfumes and cigarette smoke. These chemicals are present not only in jails, but also at some times in almost any building that is open to the public. If Adams goes into a grocery store while the floor is being cleaned with bleach, he must leave immediately or risk developing symptoms of his condition, which can include wheezing, difficulty breathing, and tightness in the chest, and that if left untreated could result in hospitalization or death. The same is true if he enters many enclosed spaces that an average person would enter regularly, and which are cleaned frequently, such as public restrooms or retail stores. The first factor therefore weighs in favor of finding a substantial limitation.

Second, the "duration of or expected duration of the impairment" could be lengthy. The symptoms Adams developed as a result of his exposure to chemicals at the jail required him to miss days of work. As his physician stated, it could even result in hospitalization or death. The second factor therefore also weighs in favor of finding a substantial limitation.

Third, Adams' impairment can be expected to have a "permanent or long-term impact." Dr. Stuart Brooks wrote in the report on his examination of Adams that "The natural history of RADS is that there may be persistent asthma symptoms which may continue for years if not indefinitely. Because his disease has been present for at least two years, I must conclude that his disease may be permanent and will require physician visits and medications in the future." Thus, all three factors the Court is instructed to consider in determining whether a condition substantially limits a major life activity indicate that Adams'

condition substantially limits him in the major life activity of breathing.

Moreover, the explanatory materials in the appendix to 29 C.F.R. § 1630.02(j) and Eleventh Circuit precedent support such an interpretation. The appendix to § 1630.02(j) provides that "The determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines." 29 C.F.R. app. § 1630.2(j). In *Harris v. H & W Contracting Company*, 102 F.3d 516 (11th Cir.1996), the court considered whether a woman with the thyroid disorder Grave's disease had a disability. Except for "a temporary episode associated with an overdose of Harris' thyroid medication," which had been the cause of Harris' termination, "Harris ha[d] otherwise been unimpeded in her life activities since first experiencing thyroid problems in 1973." *Id.* at 520. The defendant challenged the EEOC's interpretation of the ADA as requiring evaluation of a condition without medication or assistive devices. The Eleventh Circuit examined the legislative history of the ADA and found that the EEOC's interpretation of the statute was consistent with congressional intent. *See id.* at 522. Based on its judicial notice of the potential severity of Graves' disease and testimony that Harris' condition could be fatal in it were not controlled by medication, the court held that summary judgment in favor of the defendant on the issue of disability had been improper. *See id.* at 522–23.

Likewise, Adams provided unrebutted evidence that he is required to use a number of different medications to control his condition. His medical reports and deposition testimony report the use of steroid inhalers and bronchial dilators, and that his medications have been changed in response to severe attacks of RADS symptoms. Dr. Goldstein writes that in extreme cases, the airway spasm that results from exposure to chemical irritants could

result in hospitalization or death if left untreated.

## B. Working

In the alternative, Adams argues that his condition substantially limits him in the major life activity of working. The EEOC has provided additional guidance with respect to consideration of this major life activity:

With respect to the major life activity of working—

(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

(ii) In addition to the factors listed in paragraph (j)(2) of this section, the following factors may be considered in determining whether an individual is substantially limited in the major life activity of "working":

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3). Relying on this regulation, Defendants argue that Adams was not substantially limited in the major life activity of working, because he was not limited in his ability to perform either a class of jobs or a broad range of jobs in various classes.

Adams provides testimony from employees of the Sheriff's Office that contradicts Defendants' assertion. Both Colonel David Parrish and Lieutenant Harold Hill testified on deposition that virtually any jail or detention facility in which throughout the country would undergo the same sort of constant cleaning that the Orient Road facility undergoes. The appendix to 29 C.F.R. § 1630.02(j) provides the following example:

[S]uppose an individual has an allergy to a substance found in most high rise office buildings, but seldom found elsewhere, that makes breathing extremely difficult. Since this individual would be substantially limited in the ability to perform the broad range of jobs in various classes that are conducted in high rise office buildings within the geographical area to which he or she has reasonable access, he or she would be substantially limited in working.

29 C.F.R. app. § 1630.02(j). Adams' sensitivity to strong fumes from cleaning solutions and other chemical irritants substantially limits him in his ability to perform, at the very least, the jobs that are conducted in detention facilities throughout the United States.

In sum, Adams provided uncontroverted evidence regarding the nature and severity of his condition, its expected duration, and its long-term impact, along with the evidence that if not controlled by medication, it could impair Adams' breathing to the point of causing death. Taken together, this evidence demonstrates that the condition from which Adams suffers substantially limits him in the major life activity of breathing. Further, the testimony of Defendants' own employees is that Adams' condition disqualifies him from the broad

range of jobs conducted in detention facilities. Therefore, this Court finds that as a matter of law, Adams has a disability within the meaning of the ADA.

## II. Qualification

Defendants argue that Adams was not a "qualified individual with a disability," because he was unable to perform the essential functions of his job, even with a reasonable accommodation. That term is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). There is no dispute that Adams' condition made him unable to perform the duties of a Detention Deputy. However, one of the reasonable accommodations specified by the ADA is "reassignment to a vacant position." 42 U.S.C. § 12111(9).

Defendant argues that there were no vacant positions to which Adams could be reassigned, based on Adams' deposition testimony regarding his meeting with Colonel Parrish in June 1994. Adams testified Colonel Parrish went over the list of positions available in the detention department, and that the only position they discussed was a Community Service Officer position at the front desk of the jail. Adams stated that Colonel Parrish told him that he would still be exposed to chemicals in that position. Parrish's testimony regarding the same meeting is that he told Adams that there wasn't any position at all within the jail system in which he wouldn't be exposed to cleaning solutions.

■ Defendants' focus too narrowly. Where an employee requests the reasonable accommodation of a transfer, the employers' obligation is as follows:

> The employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the

employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodations. The employer's duty to accommodate requires it to consider transferring the employee to any of these other jobs, including those that would represent a demotion. *See* 29 C.F.R. § 1630.2(j)(3)(ii)(C) (defining "broad range of jobs in various classes"); 29 C.F.R.Pt. 1630, App. § 1630.2(*o*). The critical factor is the match between the employee's knowledge, skills, and abilities, and the legitimate requirements for other positions with the employer; it is not whether those other positions look exactly like the job the employee's disability prevents him or her from performing. This interpretation is consistent with the language from the House Report on the bill that became the ADA, to which we referred in *Gile*, 95 F.3d at 498:

> If an employee, because of his disability, can no longer perform the essential functions of the job that he or she has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and the employer from losing a valuable worker.

H.R.Rep. No. 485(II), 101st Cong., 2d Sess. (1990), U.S.Code Cong. & Admin.News 1990, 267. It is also consistent with the overall structure of the ADA to look to the class of jobs or broad range of jobs that the employer might give to a person with the plaintiff's qualifications. *Cf.* 29 C.F.R. § 1630.2(j)(3)(ii)(B) (defining "class of jobs").

*Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667 (7th Cir.1998). Although it is not entirely clear, both Adams and Colonel Parrish seem to indicate that they discussed only whether there were positions available within the jail itself. It is not clear that they discussed positions in the

Sheriff's Office that were not within the jail. Further, the meeting Defendants point to is only one of the numerous occasions on which Adams asked for reassignment.

Defendants do not offer any evidence that they "identified the full range of positions" for which Adams qualified, or that there were no vacant positions for which Adams was qualified during the entire eight month period between the time Defendants learned of his medical condition and the time they terminated his employment. Adams offers evidence that he was qualified to fill a number of vacant positions within the Sheriff's Office. He provides job listings showing that at approximately the same time he was terminated, there were vacant Community Service Officer, Digital Communications Dispatcher, Process Server, Fingerprint Technician, Storekeeper, and Clerk positions. Defendants' corporate representative testified in deposition that a person such as Adams who qualified to be a Detention Deputy and who received favorable performance evaluations in the position of Detention Deputy would certainly be qualified to perform the positions of Community Service Officer, Digital Communications Dispatcher, Clerk, or Process Server. This is sufficient to raise a question of material fact as to whether Adams could have performed the essential functions of his employment position if he had been given the reasonable accommodation of a transfer to a vacant position.

## III. Discrimination

Adams argues that Defendants discriminated against him by denying him a reasonable accommodation. "The failure to provide reasonable accommodation, including a transfer to a vacant position, constitutes discrimination under the ADA." *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1134 n. 5 (11th Cir.1996). Defendants argue that they did not fail to provide a reasonable accommodation because Adams applied only for the Program Coordinator position, and Hillsborough County Civil Service law barred Defendants from selecting him for a job he had not applied for through Civil Service.

Although the only position Adams applied for with Civil Service was the Program Coordinator position, he provided a great deal of evidence that he repeatedly informed Defendants, all the way up his chain of command, that he wanted to go back to work and was willing to transfer to another position. Rather than identify alternate positions for which Adams was qualified, and thereby prevent the loss of a valuable worker, Defendants told Adams that there were no positions available or that the Sheriff's Office could do nothing for him. Adams has also provided evidence that there were in fact numerous vacant positions for which he was qualified.

Defendants, however, argue that they were prevented from simply reassigning Adams by Hillsborough Civil Service rules. Defendants rely on *Duckett v. Dunlop Tire Corp.*, in which the Eleventh Circuit stated:

> We are aware of no case under either the ADA or the Rehabilitation Act where an employer has been required to transfer an employee to another position where the employer (independent of concerns about disability) has a business policy against the pertinent kind of transfer.

*Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1225 (11th Cir.1997). In *Duckett*, however, the accommodation the plaintiff requested was reassignment from a salaried supervisory position to a production position. *See id.* at 1225. It was undisputed in that case that the defendant had a long-standing "policy against 'rolling back' salaried employees into production positions within the bargaining positions with the bargaining unit." *Id.*

In this case, however, a number of factual questions remain. The selection method used to fill the Program Coordina-

tor position was not the ordinary procedure under Civil Service rules. There was testimony from Defendants' corporate representative to the effect that with respect to many positions, Defendants could "give the nod" to transfers of already-existing employees. The fact that Adams applied for the Program Coordinator position, and Civil Service found him qualified for it, raises a question of material fact as to whether Defendants in fact had a business policy against the transfer Adams requested. Second, "[w]hether the defendants acted in good faith in keeping plaintiff informed of openings may also be pertinent to a determination of whether a reasonable accommodation was made." *Zamudio v. Patla*, 956 F.Supp. 803, 811 n. 4 (N.D.Ill.1997). Third, the factual question remains of whether either transferring Adams to a pool position or notifying him that Defendants had a policy of selecting their own injured or disabled employees ahead of other applicants would have been a reasonable accommodation. Accordingly, it is

**ORDERED** that Defendants motion for summary judgment (Docket No. 13) be **DENIED.**